## CRANE *v.* SILOAM SPRINGS.

Opinion delivered October 28, 1899.

1. CONSTITUTIONAL LAW—LOCAL IMPROVEMENTS.—Const. 1874, art. 19, § 27, authorizing "assessments on real property for local improvements in towns and cities under such regulations as may be prescribed by law," does not inhibit the legislature from authorizing the creation of improvement districts embracing the entire area of a city or town. (Page 34.)

2. LOCAL IMPROVEMENTS—WATERWORKS.—Cities and towns are expressly authorized to create improvement districts, and to levy assessments, for the purpose of constructing waterworks. (Sand. & H. Dig., § 5332.) (Page 40.)

3. SAME—ORDINANCE—PUBLICATION.—The statutes regulating the creation of local improvement districts (Sand. & H. Dig., §§ 5323-5336) contemplate that two ordinances shall be passed, viz., (1) an ordinance creating the improvement district; (2) an ordinance assessing the real property of the district and appointing the board of improvement. It is provided that the first ordinance shall be published, within five days after its passage, in some newspaper published in the city or town. Within three months after such publication the second ordinance may be passed, upon the requisite petition of the property holders being filed. It is also provided that the second ordinance shall in like manner be published within five days after its passage, and that any person who may feel aggrieved by its passage "shall commence legal proceedings for the purpose of trying the validity of said assessment within twenty days after the date of said publication, or else he shall be forever barred in all courts of law or equity from questioning the validity of the assessment and the lien created thereby." *Held* (1) that the 20-days limitation bars only such omissions or irregularities as occur subsequent to the passage of the first ordinance and the publication thereof; (2) that the requirement that the first ordinance be published within five days after its passage is mandatory, and a failure to comply therewith rendered the entire proceedings void. (Page 41.)

4. SAME—COST OF SEPARATE IMPROVEMENTS—The provision of Sand. & H. Dig., § 5334, that "no single improvement shall be undertaken which alone will exceed in cost 20 per centum of the value of the real property" in the district is not violated where two improvement districts embracing the entire area of a city are created for the purpose of making two distinct improvements, viz., waterworks and electric lights, though the aggregate cost of both improvements exceeds 20 per cent of the value of the real property in the district. (Page 44.)

Appeal from Benton Circuit Court in Chancery.

EDWARD S. McDANIEL, Judge.

### STATEMENT BY THE COURT.

On February 10, 1897, the city council of Siloam Springs, a city of the second class, passed an ordinance laying off the whole of the city into a district for the purpose of constructing and maintaining a system of waterworks for the city. Afterwards, on April 19th, the council passed another ordinance assessing the cost of making such improvement upon the real property in the district, and directing that it be levied and collected in successive annual installments, so that the assessment for each year shall be one per cent of the value of the real property in the district. The council, on the day it created the waterworks district, passed another ordinance creating an improvement district for the purpose of erecting and maintaining electric lights in the city.

The appellants, J. E. Crane, et al., on the 20th day of August, 1897, brought this action to enjoin the collection of the assessment levied for the erection of the waterworks. As grounds for relief they allege, among other matters:

1st. That the ordinance creating the district was not read on three different days, nor the rules requiring the same to be read suspended.

2d. That the ordinance establishing the district was not published within five days after the designation of the district.

3d. That the council created two districts covering the same territory, and assessed for the two improvements sums in excess of 20 per cent. of the value of the real property of the district.

4th.    That the council had no authority to create an improvement district including all the real property in the city for the purpose of creating a system of water-works.

The defendants demurred to the complaint, and the circuit court sustained the demurrer, and dismissed the complaint.

*J. A. Rice* and *L. H. McGill*, for appellants.

For the general provisions of the constitution governing taxation by municipalities, see Const. art. 12, sec. 3; *Ib.* art. 19, sec. 27.    Municipal corporations also have power to provide for a water supply and the lighting of streets and alleys. Sand. & H. Dig. §§ 5134-5-6.    But this can be accomplished only by taxation of all property, real and personal, in the municipality, within the limits of five mills.    The Acts of March 22, 1881, (Acts 1881, 161), and of February 19, 1889, (Acts 1889, 17), authorizing local improvements in towns and cities by the formation of improvement districts, in so far as they attempt to authorize the inclosure of a *whole* town or city in an improvement district, are not within the constitutional provisions authorizing *local* improvements.    These acts apply only to such property as is located *within* a city, which is *adjoining to or near the improvement,* and which will be benefited thereby to *a degree in excess of the benefits to the use of the city generally.*    52 Ark. 107; 25 Am. & Eng. Enc. Law, 497-8.    The only direct authority to construct water-works is by municipal taxation.    Their exclusion in the Act of April 12, 1993, was at most a mere expression of legislative opinion on the subject, and does not bind this cause.    59 Ark. 441.    The authority to levy an assessment must be distinctly and directly made.    25 Am. & Eng. Enc. Law, 514.    The levying of the assessments for local improvements is based upon the consent of the property owners and the authorities are only their agents.    42 Ark. 152; 50 Ark. 116; 55 Ark. 148.    The special assessment is enforced only by reason of the special benefits conferred.    25 Am. & Eng. Enc. Law, 496-7; 48 Ark. 370. The presumption is not conclusive that a tract included in such an assessment is specially benefited.    52 Ark. 107; 59 Ark. 344.    The statutory requirements as to the publication of the

ordinances and conduct of the board are intended for the protection of the property owner, and must be complied with strictly. 25 Am. & Eng. Enc. Law, 537–554; 59 Ark. 344; 50 Ark. 116. Since there is nothing in the record to show when the ordinance was published, it cannot be determined upon demurrer whether or not the twenty-day statute of limitation (Sand. & H. Dig., § 5336) applies: Without the petition of a majority in value of property holders, there was no authority to levy the assessment. 50 Ark. 116; 59 Ark. 344; 25 Am. & Eng. Enc. Law, 533.

*E. P. Watson,* for appellees.

The council had authority to create an improvement district for the purpose of making any *local improvements of a public nature.* Const. sec. 27, art. 19; 42 Ark. 152. It is a question of law as to what improvements are within the general authorized power conferred by the constitution, and the courts determine each case as it arises. Cooley, Tax. 609, 610. Water pipes are. Cooley, Tax. 621. Also lighting streets by gas. *Id.* 621. The statutes of this state authorize the councils of towns and cities to make assessments for water and lighting plants. Act April 12, 1893; Act June 26, 1897 (p. 114); Sand. & H. Dig., § 5321. The act of Feb. 19, 1881 (Sand. & H. Dig. § 5321, *supra*), being in the nature of a declaratory statute, and having been passed before the assessments complained of, is binding on appellants. Cooley, Const. Lim. 92–96. The assessment of property for a local improvement, levied upon petition of the property owners, is not a *tax.* Cooley, Taxation, 621. When an improvement must of necessity benefit the whole city, the council may, upon being petitioned, lay off the whole city into an improvement district. Sand. & H. Dig., §§ 5321, 5322. Except when attached for fraud or demonstrable mistake, the action of the council in including property in an improvement district is conclusive of the fact that it is *adjoining the locality* to be effected. 52 Ark. 112; Cooley, Taxation, 638–40. The presumption is that the ordinance was duly published. 24 Ark. 402; 30 Ark. 72; 49 Ark. 449; 50 Ark. 276; 45 Ark. 295; 19 Am. & Eng. Enc.

Law, 42, 50, 43. The burden of disproving this was on appellants. 53 Ark. 377; 56 Ark. 272. Appellants are barred by the twenty days statute of limitation. Sand. & H. Dig., § 5336.

*J. A. Rice* and *L. H. McGill*, for appellants, in reply.

On the general principles involved, see also 172 U. S. 269; Cooley, Taxation, 641.

RIDDICK, J., (after stating the facts). This is an action to enjoin the collection of an assessment made upon real property in the city of Siloam Springs, and the questions presented arose on a demurrer to the complaint. The assessment was made for the purpose of constructing and maintaining a general system of waterworks for the city. The whole area of the city was laid off into an improvement district for that purpose, and the first question presented is whether the city council had power to lay off the whole city into an improvement district. It is admitted that our statute expressly authorizes the city or town council to lay off the whole city or town into an improvement district for the purpose of making a local improvement, when, to quote the language of the act, "the whole of the desired improvement be general and local in its nature to said town." Sand. & H. Dig., § 5322.

But it is said that an improvement benefiting the real property of the whole city is not a local improvement, within the meaning of our constitution, which impliedly forbids assessments in towns and cities for other than local improvements, and that the statute above quoted is, therefore, unconstitutional and void to that extent. The section of the constitution referred to is as follows: "Nothing in this constitution shall be so construed as to prohibit the general assembly from authorizing assessments on real property for local improvements in towns and cities under such regulations as may be prescribed by law, to be based upon the consent of a majority in value of the property holders owning property adjoining the locality to be effected; but such assessments shall be *ad valorem* and uniform." Sec. 27, art. 19, Const.

Now, in endeavoring to ascertain the meaning of the different provisions of our state constitution, we should remember that many of them had their origin in events long past, and which are recorded in the history of the English people. It is therefore proper that we should consider this history in ascertaining the object of these provisions and the meaning of the language used. The doctrine of local assessments for local improvements to which the provision under consideration refers is not altogether of modern origin. "It had its origin and development," said the Supreme Court of Mississippi, "in the principle of local self-government characteristic of free institutions, founded by the Anglo-Saxon race, the leaving to each local community the due administration of the affairs in which it had an exceptive, peculiar and local interest." *Macon* v. *Patty*, 57 Miss. 378, 399.

Ages of ceaseless struggle for local self-government firmly imbedded this idea in the race to which we belong.* "The several state constitutions have been framed with this system in view, and the delegations of power which they make, and the express and implied restraints which they impose thereupon, can only be correctly understood and construed by keeping in view its present existence and anticipated continuance." Cooley's Const. Lim. (4 Ed.) 230

It is well, also, to observe, in this connection, that the municipal bodies formed for local government have not only "their public or political character in which they exercise a part of the sovereign power of the state for governmental pur-

---

*The long and persistent struggle by which the right of local self government was finally won and secured to English towns and to the English race is thus referred to by the historian Green: "In the silent growth and elevation of the English people the boroughs led the way; unnoticed and despised by prelate and noble, they had alone preserved the full tradition of Teutonic liberty. The rights of self government, of free speech in free meetings, of equal justice by one's equals, were brought safely across the ages of Norman tyranny by the traders and shop-keepers of the towns. In the quiet, quaintly named streets, in town-mead and market-place, in the lord's mill beside the stream, in the bell that swung out its summons to the crowded borough-mote, in the jealousies of craftsmen and guilds, lay the real life of Englishmen, the life of their home and trade, their ceaseless, sober struggle with oppression, their steady, unwearied battle for self-government." (Green's Short History of the English People, 121.)

poses, they have their private character, in which, for the benefit or convenience of their own citizens, they exercise powers not of a governmental nature, and in which the state at large has only an incidental concern." Cooley on Taxation, 688; *People* v. *Common Council*, 28 Mich. 228.

Provisions for local conveniences, like water, light, public parks for recreation and other public accommodations of the same kind, are some of the matters which are furnished or provided for by municipal corporations in their quasi-private capacity, in which they act, not as an agency of the state, but exclusively for the benefit of their own inhabitants. It is in respect to such matters of local concern that the largest freedom of action has been allowed municipal corporations. The constitutions of the different states, as a rule, leave their legislatures free to confer ample powers upon such bodies in the matter of laying assessments to provide for such local conveniences when the improvement adds benefit to the local real estate. "The case," says Judge Cooley, "must be extraordinary and clearly exceptive to warrant any court in declaring that the discretion has been abused, and the legislative authority exceeded." Cooley on Taxation (2 Ed.) 145, 688, 689; *State ex rel Bulkeley* v. *Williams*, 68 Conn. 131; *Williams* v. *Eggleston*, 170 U. S. 304.

Keeping in mind these words of the learned author, let us see if it is clear that the framers of the constitution, by authorizing assessments on real property for "local improvements in towns and cities," intended to limit the legislative discretion in conferring such power to improvements made in some particular locality of the city, and when it would follow that the improvement would be less in extent than the area of the city. If there be such limitation, it must be implied from the use of the phrase "local improvements," for there is certainly no express limitation to that effect. But the word "local," which is the restrictive word in that phrase, is often used in reference to towns and cities so as to include the whole municipality. We speak of the "local affairs" of a town, its "local government," the rights of its inhabitants to "local option," or their liability to "local taxation," referring in each instance to the whole

corporation. In the same way, if the local authorities of a town should undertake a general system of street improvement, or a general system of sewerage, covering every street therein, we might, using language in its ordinary meaning, speak of such work as a "local improvement," the purpose thereof being a benefit to the local inhabitants. If we look for the technical or legal meaning of the phrase "local improvement," we find it to be a public improvement, which, although it may incidentally benefit the public at large, is made primarily for the accommodation and convenience of the inhabitants of a particular locality, and which is of such a nature as to confer a special benefit upon the real property adjoining or near the locality of the improvement. *Little Rock* v. *Katzenstein*, 52 Ark. 107; *Rogers* v. *St. Paul*, 22 Minn. 494; 13 Enc. Pl. & Pr. 296.

Supposing this to be its meaning as used in our constitution, there is still nothing to exclude the idea of an improvement district embracing the entire city. It is true that the improvement must be in the city, but an improvement affecting every street in the city would be in the city, and might, in its nature, be such as to confer a special benefit upon the real property of the city, and only an incidental benefit to the general public. Many dwell in cities who do not own real estate, and where the public improvement is such as to confer a special benefit on real property the expense of making it should be borne, at least to the extent of the benefit, by that portion of the public beneficially affected, and not by those who receive no benefit. And this is equally true whether the improvement be confined to a single street, or is such as to include every street in the city. In truth, as each additional improved street adds to the convenience of those dwelling on other connecting streets, there would be more uniformity and equality of burdens in a general system of improvernment by an assessment upon property adjoining the improved streets than there would be in requiring one street to be improved by an assessment upon property adjoining it. If one street only is improved, those bearing the burden have the same expense, but not the full benefit, they would receive were the other

streets also improved, while other owners of property gain incidental advantages, yet bear none of the burden. *Macon* v. *Patty*, 57 Miss. 378; *Lexington* v. *McQuillan*, 9 Dana (Ky.) 513; *Leominster* v. *Conant*, 139 Mass. 384; *Parsons* v. *District of Columbia*, 170 U. S. 45.

It is doubtless true that those inhabitants of the town who own no real property gain incidental advantages from local improvements, and for this reason such improvements are sometimes made in part out of the general fund of the municipality and in part by assessment. But this is permissible whether the improvement district embrace a part or all of the city, for, although the city and district may cover the same territory, they are never the same. In either case, whether the district be great or small, the object in creating it, and the reason that underlies the procedure, is that those receiving special benefits may to that extent bear the burden of the improvement. *Norwood* v. *Baker*, 172 U. S. 269.

No express limitation is found in the constitution forbidding the legislature from authorizing such an equitable apportionment of the assessment in case of an improvement affecting all the real estate of the city, and none should be adduced by implication through a narrow and technical line of reasoning; for this would not only be contrary to the usual rule of allowing the largest liberty in matters of local concern, but, if we should find such a limitation, it would puzzle us to say at what point the power of the legislature would stop. Could it authorize an assessment for an improvement affecting nine-tenths or ninety-nine hundreths of the real property of the city, but not for one affecting the whole city? If a city has a hundred streets, may the legislature authorize the council to place ninety nine of them in an improvement district for the purpose of laying water pipes along them or for improving them, and yet not authorize such a district covering all the streets for such a purpose? What could be the object in making such a limitation, and why make such a distinction? We do not see any reason, nor do we believe that the constitution contains any such limitation upon the power of the legislature.

In coming to this conclusion, we do not overlook or disregard the word "local" in the phrase "local improvements." On the contrary, we attach much importance to it. The use of this phrase limits the power to authorize assessments in cities and towns to those public improvements which are local in their nature, and intended for the convenience and accommodation of the local public, or some portion thereof, and which confer a special benefit upon the real property assessed. It distinguishes such improvements from those that are not local, but intended for the benefit of the general public. Not every improvement in a town or city is a local improvement. A county court house or capitol for the state might be an improvement in a town or city, and in some cases a very desirable improvement, but, being designed and intended for the use and convenience of the general public of the county or state, it would not be a "local improvement," within the meaning of our constitution; or, if such a structure could in any sense be considered a local improvement, it would not be to the full extent of the cost. A town or city hall would probably come within the same category, for, while intended for the convenience of the local community, it would not usually be an improvement of such a nature as to confer a special benefit upon local real estate or the owners thereof, and therefore not a local improvement within the meaning of the law. A consideration of these and other illustrations which could be made we think clearly shows the meaning and purpose of the phrase "local improvements" as used in our constitution.

The framers of that instrument by this section, which expressly recognizes the power of the legislature to authorize assessments on real property in towns and cities, but limits them to local improvements, and requires that they should be made only on property adjoining the locality affected, and be based upon the consent of a majority in value of the owners of such property, did not intend arbitrarily to forbid an assessment for an improvement specially benefiting the real property of the entire city, or to prevent an equitable apportionment of the tax in such a case. They had, as we think, a broader purpose in view. Their object was to limit such local assessments to

proper local purposes, to undertakings intended mainly for the accommodation and convenience of the inhabitants of the city, or of the district upon which the tax was laid. They attempted by the limitations imposed, to prevent unjust apportionments, to keep property from being burdened with assessments without corresponding benefit. They endeavored, as far as practicable, to protect the honest and prudent property owner against those unscrupulous persons who seek to make a private gain by the expenditure of public funds, and also against the equally dangerous class that, swayed by their imaginations, see fortunes in all sorts of undertakings, and clamor for extravagant assessments and appropriations, with a view to advantages which, except the expenditure they entail, often prove as evanescent as a mirage on a desert. The limitations which they imposed in order to effect these purposes usually result in confining assessments for any particular improvement to a limited portion of the city. But this does not prove that in a proper case the whole area of the city may not be included in a district, and assessed for an improvement.

Conceding that the legislature has power to authorize an improvement district embracing the whole area of the city, it is denied that it has conferred upon the city authority to make special assessments for the purpose of constructing water-works, or that it has power to confer such authority. But the different acts of the legislature on that subject show clearly an intention to confer such authority upon the city council. Sand. & H. Dig., §§ 5321, 5322, 5332.

As the power to provide a supply of water by constructing water-works from general taxes has been also expressly conferred on cities, it is said that this by implication forbids them from making special assessments for that purpose. The argument would be strong if the legislature, in the statute conferring power upon cities and towns to make special assessments and regulating the same, had used only general terms, and not specially named waterworks. This was one of the reasons upon which the decision in the case of *Morgan Park* v. *Wiswall*,

158 Ill. 262, was based, where the learned judges of the Supreme Court of Illinois reached the conclusion that a village in that state had no power to make a special assessment to construct water-works.  But this argument has no force when it clearly appears from the statute that the legislature did intend to confer such power.  Now, our statute, after providing that the city may be laid off into an improvement district, provides that the money raised by assessment may be expended "in the purchase of land or erection of. houses, reservoirs or other improvements necessary for the proper construction and operation of water-works outside of the limits of the city in which said district exists."  Act April 12, 1893.  It also provides how the water-works may be operated after their construction by the improvement district.

This act leaves it no longer doubtful, but very clear, that the legislature did intend to authorize the city council to levy special assessment for the construction of water-works.  The decision of the circuit court on these points we think was correct.  The complaint does not show of what this particular system of waterworks which the city of Siloam Springs proposed to erect consisted.  Whether it was a local improvement, within the meaning of our constitution, whether the land sought to be taxed adjoined the locality affected, and whether or not it received a benefit from the improvement, are questions of fact which cannot well be determined on a demurrer.  The allegations of the complaint in regard to these questions are not in all respects definite, but, as this can be cured by amendment we will, without noticing them further, pass to the next question which disposes of the case here.

The complaint alleged facts showing that the improvement district had not been lawfully established, and it is stated in the brief of appellees that the circuit court sustained the demurrer mainly on the ground that the facts stated in the complaint show  that the action was not commenced within twenty days after the publication of the ordinance making the assessment, and that the action was therefore barred by the statute.  The statute regulating the method by which real property in cities and incorporated

towns may be assessed for local improvements provides that, upon the petition of ten resident owners of real property in any city, the city council may lay off the city, or any portion thereof, into an improvement district, and it further provides that the ordinance establishing the district shall be published. Sand. & H. Dig., §§ 5322, 5323. Having made provision for the establishment of the district, the statute then sets forth the steps necessary for procuring an assessment upon the real property in the district, and for the publication of the assessment ordinance. Sand. & H Dig., §§ 5324 to 5336. It will be noticed that the statute makes provision for two separate proceedings and two separate ordinances, each having as its foundation a petition of owners of real property in the city. The object of the first proceeding is to procure an ordinance establishing an improvement district, and the statute provides that "within five days after the designation of such district or districts the clerk of said city shall publish the order or ordinance of the council establishing the district in some newspaper published in said city for one insertion." Sand. & H. Dig., § 5323.

Now, following the provision for the publication of this ordinance, there is no limitation of the time within which the property owner may show that the district has not been legally established. But the passage of the ordinance establishing the district and the publication thereof is the basis of the second proceeding relating to the assessment. This second proceeding must be commenced by a petition of a majority in value of those owning land in the district, and may result in the passage of an ordinance making an assessment. In that event the statute provides that, within five days after the passage of the ordinance making the assessment, "the clerk shall publish a copy of it in some newspaper published in the city one time; and any one who may feel aggrieved thereby may object to the assessment; and such person shall commence legal proceedings for the purpose of trying the validity of said assessment within twenty days after the date of said publication, or else he shall be forever barred in all courts of law or equity from questioning the validity of the assessment and the lien created thereby." Sand. & H. Dig., §5336.

It is contended by counsel for appellees that this provision of the statute cuts off all omissions, irregularities and errors on the part of the council in creating the improvement district, and making the assessment upon the property therein, unless the action contesting the same be commenced within twenty days after publication of the order of assessment. The question is not free from doubt, but, after considering the same, we are of the opinion that the section quoted has reference to errors or irregularities on the proceeding upon the second petition relating to the assessment, and that the twenty days limitation bars only such omissions and irregularities as occur subsequent to the passage of the ordinance establishing the district and the publication thereof. If no improvement district has been established, then the petition for the assessment and the ordinance thereforhaveno foundation to rest upon, and are without authority and void, for the council has no power to make the assessment until after a district has been established and publication made in accordance with the statute. The property owners may set up and show this want of authority before or after the expiration of the twenty days from the publication of the assessment ordinance.

We cannot concur in the contention that the requirement of the statute that the ordinance creating the district shall be published within five days after its passage is not mandatory. The intention was that the owners of real estate to be affected should have early notice of the creation of the district and of the scheme to levy assessments upon their property. The statute does not permit a majority in value of the owners of land in the district to come in and by one petition procure an ordinance establishing a district and levying an assessment for erecting the improvements. It requires that the ordinance creating the district and indicating the contemplated improvement shall be first passed, and notice of its passage given by publication within five days. It is important that this notice should be given in the manner and within the time prescribed by the statute; for it is in the nature of a warning to all owners of land in the district that a proceeding of that kind is on foot. So that if they wish to oppose

the undertaking they may at the beginning, before public sentiment in regard thereto has become fixed, have an opportunity of discussing the question with other owners of land in the district, and, if the undertaking be unwise, perhaps defeat it by securing a majority in opposition to it. Failing in this, they can still be on guard, and watch the proceedings leading up to the assessment, to see that they are regular and in conformity with the law. We think, for these reasons, that the provision as to the time of the publication is for the benefit and protection of the land owners of the district, and must therefore be treated as mandatory. 13 Enc. Pl. & Pr. 307, and cases cited.

The complaint alleged facts showing that the ordinance establishing the district was not legally adopted, and not published within the time and in the manner required by law. It therefore stated a good cause of action, and the demurrer should have been overruled.

As to the question of the cost of two different improvements, we have to say that the statute provides that no single improvement shall be undertaken which alone will exceed in cost 20 per centum of the value of the real property in the district, but when there are two different improvements, with two districts, the statute does not forbid that the aggregate cost of such improvement shall exceed the per cent named.

There are many other points discussed, but, as most of these will probably pass out after the filing of the answer, we feel it unnecessary to discuss them further.

For the reasons stated, the judgment is reversed, and the cause remanded, with an order to overrule the demurrer and for further proceedings.

BUNN, C. J., (dissenting.) These two cases are identical, so far as the points at issue are concerned, and I will treat them as one case.

It is admitted that these suits were not brought within the twenty days after the publication of the assessment ordinance on the 22d of July, 1897, and unless that limitation upon actions of this character is for some reason inapplicable to this case, these suits were barred, and the lower court's judgment

of dismissal on demurrer and failure to plead over should be affirmed.

By the decision of the majority of this court, however, the statute bar is obviated, for the reason assigned that the first or organizing ordinance of February 10, 1897, was not published within 5 days provided by statute from and after its adoption by the city council. It is argued, from this premise, that the provision of the statute requiring this publication to be made in the local newspapers within the 5 days after the adoption of the ordinance is mandatory, and not directory merely; and, being such, the failure to make the publication within that time is a fundamental defect, on account of which all after proceedings were mere nullities; and that it could be set up, notwithstanding the suits were not instituted within twenty days from and after the publication of this last or assessment ordinance. I do not think that a statute of limitation upon actions is to be made applicable or not to a case merely because a defense is fundamental or not, or is even jurisdictional or not; for, even in this latter case, the statute of limitations cuts off all inquiry as to jurisdiction as well as everything else, and the defendant's remedy is by certiorari, or some such direct proceeding, if he has any.

Moreover, I think a land owner can raise all kinds of legal and valid objections to any and all of the proceedings to organize the district and assess the rates upon his lands within the twenty days, and, having this right, he will not be allowed to say that the prior acts and proceedings of the district, made without notice to him, cannot be inquired into after the assessment ordinance is passed, and that therefore he is without remedy by reason of the defect in the organization. He has a day in court for all matters affecting his interest, and, failing to avail himself of the opportunity afforded to make his objection, he is barred. This principle entered into the decision of *Carson* v. *St. Francis Levee District*, 59 Ark. 513.

It is hardly necessary to discuss the question whether the requirement of the publication of the organizing ordinance within five days is mandatory or directory, if my position be the correct one. But one or two considerations affecting that

question may not be inappropriate just here. The legislature cannot be presumed to do a useless thing, or to have enacted a law that may be impossible, or even impracticable, of execution under certain circumstances likely at any time to present themselves. At least, we ought always to give such construction to legislative enactments, if possible, as will obviate such embarrassing difficulties and obstacles.

These publications often are to be made in weekly newspapers, each of which has its fixed day of publication. As a matter of fact, the typesetting is ordinarily done on the day previous to the publication day, and this almost of necessity. The town council has also its regular days of meeting, or rather days for its regular meetings. If it should so happen that one of these meetings should fall on the 10th of February, and it should pass the ordinance on that day, as in the case at bar, and that or the next day should be the weekly newspaper's publication day, then the recorder could not possibly have the ordinance published within five days from its passage, and, if published in the very next issue of his town paper, that would be seven days at least after the publication, and his ordinance would be a nullity, according to the decision of the court. Again, the recorder is given the five days in which to copy and otherwise arrange his ordinance for publication. His newspaper must necessarily have its publication day on or before the fifth day, or it could not publish the ordinance within time under any state of things, if the limitation be strictly mandatory. It is plain that a publication in the first issue of the paper after the ordinance is ordered to be published is all that is required, except that the recorder must do all that he can within the five days.

The dates given in this record show that the ordinance was passed on the 10th of February; that the next publication day of the paper was the 15th of February, until which time the recorder had to copy his ordinance for publication. He may have got it ready on the 14th, and presented it to the newspaper publisher, but it had to lie over for reasons stated, and was published on the next publication day—the 22d. It

'is simply very unfortunate that the legislature did not name seven or a greater number of days instead of five, if the statute is to be held strictly mandatory; for, as it stands, an ordinance may be annulled without anyone being in fault.