## Lipscomb *v.* Lenon.

## Opinion delivered October 26, 1925.

1. Improvement districts—consent of property owners.—It is within the power of the Legislature to create local improvement districts embracing therein both rural and urban territory without the consent of a majority in value of the owners of real property included in the district.

2. Improvement districts—benefit to land.—Unless the land embraced in a local improvement district is peculiarly and especially benefited by the improvement contemplated, there is no justification for the creation of such a district.

3. Municipal corporations—improvement district—construction of auditoriums.—Act No. 13 of the Extraordinary Session of Legislature of 1923, approved October 10, 1923, authorizing the formation of improvement districts for the building of auditoriums, is unconstitutional as authorizing the imposition of the burden of assessments upon lands which would not be benefited thereby.

Appeal from Pulaski Chancery Court; *John E. Martineau,* Chancellor; reversed.

*J. C. Marshall,* for appellant.

*Gus Fulk* and *Thos. S. Buzbee,* for appellee.

Wood J. The only question presented by this appeal is whether or not act No. 13 of the Acts of the Special Assembly of 1923, approved October 10, 1923, is unconstitutional. The act is entitled "An act to authorize the formation of improvement districts for the building of auditoriums for public meetings." Section 1 provides in effect that a place of public assembly is a matter of public necessity where there are as many as fifty thousand inhabitants in any congressional township in this State or in any two or three such contiguous townships or contiguous parts thereof, and that the construction of a suitable auditorium is a local improvement beneficial to the real property therein.

Section 2 provides that where the population of such congressional townships is not less than fifty thousand inhabitants, they may form an improvement district for the purpose of building auditoriums for public meetings

when a majority of the inhabitants of such districts approve such formation at an election, to be called by the county court in which such districts are situated.

Sections 3 and 4 provide for the necessary steps to be taken for the election, and for the establishment of the district by judgment of the county court entered upon its records if it finds that a majority of those voting at the election are in favor of the establishment of the district.

Sections 5 and 6 provide for the appointment of a board of commissioners after the establishment of the district and prescribe their powers and duties. The district is constituted a body politic and corporate with power to sue and be sued. The commissioners are to prepare plans for the auditorium and to enter into contracts for the erection thereof, and to acquire suitable location therefor, all of which is to be submitted to the county court, and, when approved by it, the commissioners are to proceed to assess the benefits to accrue to the real property in the district.

Subsequent sections provide for the assessment of benefits, the issuing of bonds, and contain all necessary provisions for the building and maintenance of the auditorium contemplated by the creation of the district. Section 29 is as follows: ''Provided this act shall include all cities and towns of the first class.''

The act is lengthy, and it is unnecessary to set forth its various provisions. It will be observed from the above that it provides for the establishment of local improvement districts by judgment of the county court in either rural or urban territory, or both, when there are as many as fifty thousand inhabitants in any congressional township, or in two or three such contiguous townships, or contiguous parts thereof, for the purpose of building auditoriums for public meetings; provided a majority of the inhabitants of such territory vote in favor of the creation of such districts. The county court of Pulaski County, on the 17th of February, 1925, entered a judg-

ment creating an improvement district known as "The Little Rock Community Auditorium District," after finding that all the provisions of the act authorizing its establishment had been complied with. The court then appointed the commissioners of the district to make the improvement contemplated by the act, and these commissioners were proceeding, and will proceed, unless restrained, to build the auditorium contemplated by the act.

E. J. Lipscomb, a resident citizen and owner of real estate in the district, instituted this action for the benefit of himself and all other tax payers similarly situated against the persons named as commissioners of the district, and the district, to restrain them from proceeding under the terms of the act to build the auditorium. He challenges the constitutionality of the act and the validity of the district on numerous grounds, only one of which we find necessary to consider, namely: "the proposed auditorium is not such a local improvement as may be built and maintained by local assessments on real estate."

The petition of land owners for the creation of the district contains a description of the lands to be included therein, and the order of the county court establishing the district includes therein the territory described in the petition. (See note)

---

Note. All that part of township two (2) north, range twelve (12) west, lying on the south side of the Arkansas River.

All that part of sections one (1), two (2), and three (3), lying on the south side of the Arkansas River, and all of sections four (4), five (5), six (6), seven (7), eight (8), nine (9), ten (10), eleven (11), twelve (12), thirteen (13), fourteen (14), fifteen (15), sixteen (16), seventeen (17), eighteen (18), nineteen (19), twenty (20), twenty-one (21), twenty-two (22), twenty-three (23), and twenty-four (24), township one (1) north, range twelve (12) west.

Sections one (1), two (3), three (3), four (4), nine (9), ten (10), eleven (11), twelve (12), thirteen (13) fourteen (14), fifteen (15), sixteen (16), twenty-one (21), twenty-two (22), twenty-three (23), and twenty-four (24) of township one (1) north, range thirteen (13) west.

It will be seen that the district embraces lands situated in townships one and two of Pulaski County. By reference to the description it will be noted that there is a large area of rural land, and the greater portion of the city of Little Rock included in the district, but the district does not embrace a considerable portion of Little Rock, and a large part of the rural territory embraced in the district is unoccupied, being covered by Fourche Bottoms and mountains adjacent to the city, and other uninhabited territory.

We have often ruled that it is in the power of the Legislature to create local improvement districts embracing therein both rural and urban territory without the consent of a majority in value of the owners of the real property included in the district. *Shibley* v. *Fort Smith & Van Buren Dist.*, 96 Ark. 410-417; *Butler* v. *Com. Fourche Dr. Dist.*, 99 Ark. 100, 103; see also *Cox* v. *Imp. District No. 8 of Lonoke County*, 119 Ark. 126. But, unless the land embraced in a local improvement district is peculiarly and especially benefited by the improvement contemplated, there is no justification under our Constitution and laws for the creation of such districts, whether the lands constituting the district be entirely rural or urban territory, or both. No better definition has ever been given of a local improvement than that by Judge RIDDICK, speaking for the court in *Crane* v. *Siloam Springs*, 67 Ark. 30, at page 37, where he said: "If we look for the technical or legal meaning of the phrase 'local improvement,' we find it to be a public improvement, which, although it may incidentally benefit the public at large, is made primarily for the accommodation and convenience of the inhabitants of a particular locality, and which is of such a nature as to confer a special benefit upon the real property adjoining or near the locality of the improvement."

In the recent case of *Williams* v. *Arkansas County Court House Improvement District*, 153 Ark. 469, we had under review an act of the Legislature creating an im-

provement district embracing all the lands in Arkansas County for the purpose of building a court house in the city of Stuttgart. At page 472, we said: "Counsel for the commissioners of the district rely upon our cases holding that local improvement districts may be organized for the purpose of improving roads and building bridges and wharves. ( Citing cases). We do not think these cases are any authority for the organization of such a local improvement district as the one in question. The question of what shall be considered a local improvement is determined by the nature and character of the improvement itself. Of course, every local improvement must be for a public and not for a mere private purpose. Moreover, local assessments are a species of taxation, and there must be some special or peculiar benefit to the property upon which the assessment of benefits is made. We have held that roads, bridges and wharves may be the subjects of local improvements, because the adjoining property will be especially and peculiarly benefited, and that the benefit to the public is merely incidental. That the improvement will benefit adjoining property more than that at a distance is not conclusive as to the nature of the improvement. The primary purpose and effect of a local improvement must be to benefit the adjoining property, although it may incidentally benefit the public. * * * In the case of building roads, bridges and wharves, the primary object to be accomplished is the benefit of the adjoining property, and the benefit to the public is merely incidental."

While the act under review does not specify that the auditorium contemplated must be erected in the city of Little Rock, yet it is obvious that such is the manifest purpose in the creation of the district, as indicated by the name of the district in the order of the county court establishing the same. An auditorium located elsewhere in the district would be wholly useless and unavailing to the great majority of the owners of real property in the district and to the public whom the district proposes to serve.

Now the purpose of building an auditorium in the city of Little Rock could be none other than to provide an assembly room or community meeting-house where, as occasions may require, large masses of the inhabitants of the city and possibly inhabitants of territory not embraced in the district, but contiguous thereto, may congregate. Such a building is manifestly not needed for the assembly of the people of the district or their representatives in the transaction of any of the ordinary business and social affairs pertaining to the community life. There are numerous auditoriums in the city adapted and devoted to these uses, such as churches, theatres, school houses, court houses, the city hall, etc. These afford ample space for any of the ordinary civic assemblies in pursuit of business or pleasure.

So, the building of an auditorium could only be for the purpose of accommodating greater congregations than could assemble in any of the above structures; and such assemblies, at most, would only be rare and occasional, such as the coming of a great national political convention, or other conventions of various kinds, when the housing of larger crowds demands a more capacious assembly room than any of the public buildings now in the city affords. On such occasions a suitable auditorium would indeed be a most desirable improvement, and one that every progressive city should have for the convenience, comfort and pleasure of the inhabitants of the city and its environs. But, plainly, such an auditorium is for the benefit of the whole community who may be served by it individually and collectively, and it cannot and does not confer any peculiar or special benefit upon the real estate assessed and taxed for its construction and maintenance. If it could be said that such an improvement is essential to the progress and prosperity of the city and suburban communities, the contribution which an auditorium makes to such prosperity is general to the entire community and not peculiar and special to the real property in the city and outlying contiguous territory.

Whether the building of an auditorium would be beneficial rather than harmful to the real property immediately contiguous thereto would be wholly problematical and dependent upon many contingencies, notably the character of the architecture and construction and the nature of the assemblies gathered there, etc. Certain it is there is no such similarity between an improvement district for the construction of an auditorium and improvement districts for the construction of roads, bridges, wharves, levees, drains, etc., as would bring the former in the category of the latter. In the former the benefit, at most, to the real property can only be incidental and of the most remote and general character, while in the latter, it must be, and is, a peculiar and special benefit to the real property taxed for its construction.

Counsel for the appellees contend that there is no real distinction in principle between the case at bar and the cases of *Matthews* v. *Kimball*, 70 Ark. 451, and *Solomon* v. *Wharf Imp. Dist. No. 1*, 145 Ark. 126. But it occurs to us that the difference in the cases is very pronounced. In the case of *Matthews* v. *Kimball, supra,* an improvement district was formed designated "The City Park District" embracing the whole of the territory comprised in the city of Little Rock for the purpose of "acquiring, improving and maintaining a city park." The real estate assessed for the improvement was wholly within the city limits. That of itself is a marked distinction between that case and this. Then, too, a city park is a wholly different character of improvement from a city auditorium. A city park, properly kept and maintained, adds decidedly to the attractiveness, and hence, enhances the value, of the real property immediately contiguous thereto, and to the beauty of the whole city, considered as a corporate entity. It is easy to see that all of the property within the corporate limits may be considered property adjoining the locality to be affected when so found by the Legislature or the city council; whereas real property beyond the city limits and more

sparsely settled, much of which is wide open spaces entirely wild and inaccessible, is demonstrably property not adjoining the locality to be affected, and cannot be commercially affected by the building of an auditorium upon some small plot of ground in a city.

It occurs to us also, though the distinction is not so clear, that a city park enhances commercially all the territory within the corporate limits of the city because it affords a place of recreation for the health, comfort and pleasure of every inhabitant of the city at all times with out money and without price; that, not only from an aesthetic, but also from a practical and financial, viewpoint, it makes the city as a whole a more beautiful, attractive and desirable place to live. Any improvement of that character necessarily enhances the value and thereby benefits all the real property within the city. The same cannot be said of an auditorium. Many of the assemblies that may be gathered there are necessarily exclusive in their nature in that the public would have to pay to attend them, and those who are unable to pay would be shut out from the entertainment there afforded the more fortunate and prosperous. In this connection it should be stated that the opinion in the case of *Matthews* v. *Kimball, supra,* was by a divided court, Justice BATTLE and RIDDICK dissenting. While the doctrine of that case has never been impaired, and we still adhere to it as the sound doctrine, yet we recognize the fact that it approaches the very verge of constitutional sanction in holding that the entire real estate within the city limits may be included within an improvement district for the purchase and maintenance of a city park. Certainly, the doctrine there announced should not be so extended by interpretation as to confer authority upon the Legislature to itself create, or delegate to other agencies the power to create improvement districts, such as we now have under review, to be paid for solely by the owners of real property in such districts.

The other case of *Solomon* v. *Imp. Dist. supra,* upon which appellees rely, involved the validity of an ordi-

nance creating an improvement district in the city of Helena for the purpose of constructing a wharf on the Mississippi River and the necessary approaches thereto. In that case, to justify the action of the council, it was shown that the barges operated by the Government were so constructed that no landing could be made along the Mississippi River for the purpose of loading and unloading freight unless such landing was equipped with the necessary facilities for loading and unloading from said barges to wharves; and the barges did not stop at the city of Helena for the reason that the city did not possess adequate terminal facilities. It was shown that the improvement would greatly increase local trade, and would make the city of Helena a distributing point for large volumes of freight going by river and rail, and that the improvement contemplated would result in a 20 per cent. reduction in freight rates, and would bring a large increase in population to the city, and a direct increase in value to the residence lots of the city as well as to the business districts.

The facts of that case argue themselves and show that the real property included in the district was peculiarly and especially benefited by the improvement. The city was "bottled up," and, in a sense, stagnation in a business way confronted it, which affected materially the value of real property in the city.

But in the case at bar, even if it could be said with any plausibility that the building of an auditorium directly and specially benefited the real estate situated within the city of Little Rock, it would strain the wildest imagination to the breaking point to conceive how such an improvement would be of any direct and special benefit to the real estate situated on Fourche Mountain, or in Fourche Bottoms, or to any other real property lying in those country portions of the townships included in the district—those beyond the limits of the city of Little Rock. The act, on its face, carries its own death wound, and shows a demonstrable mistake on the part of the law-making body in its enactment.

The court erred in sustaining the demurrer to the appellant's complaint and in dismissing the same. The decree is therefore reversed, and the cause remanded with directions to overrule the demurrer and for further proceedings according to law and not inconsistent with this opinion.

SMITH, J., (dissenting). The act which has fallen under the opinion of the majority does not require the building of an auditorium. It merely declares that an auditorium may be the subject of a local improvement, to be paid for by special assessments. The authority to build is made contingent upon the vote of the people of the city and the subsequent approval of the plans for the auditorium by the county court. The act does include both urban and rural territory; but this is unimportant under the majority opinion, for the reason that an auditorium cannot be the subject of an improvement district in either urban or rural territory, or both. The majority have judicially determined that an auditorium cannot confer such special benefit on real estate, either urban or rural, or both, as to justify the imposition of special taxes for its construction.

In my opinion, the court should not have so declared as a matter of law, but should have respected the legislative finding to the contrary. The Legislature may know some things of which we are ignorant, at least in our capacity as judges. At any rate, the General Assembly must first act, must provide the necessary legislation, before improvement districts of any kind may be organized for any purpose. The Legislature has a solemn and original duty in the premises; and when it has exercised the function with which the Constitution clothes it, its finding should be respected by the courts, unless it so clearly appears as to leave no room for doubt that it has exceeded its constitutional authority.

Legislative action may be reviewed by the courts, not to decide the wisdom or expediency thereof, but solely to ascertain whether the power to act has been denied

the Legislature by the Constitution. These elementary statements of the law require no citation of authority to sustain them.

Here the Legislature has said that an auditorium might, in certain cases, where the electors have assented thereto, be the subject of a local improvement. The court has refused to respect this finding, and by a process of reasoning has reached and announced the conclusion that this finding is false. This has been done, notwithstanding the universal rule for the government of the courts in the construction of such legislation is to respect the legislative finding unless that finding was arbitrarily and demonstrably erroneous. This court has many times applied that rule in upholding legislation.

At section 14 of the chapter on Special or Local Assessments in 25 R. C. L., page 99, it is said: ''The question of the necessity and reasonableness of a local improvement is for the determination of the Legislature, not the courts, and the legislative determination of the character of an improvement as a local one is conclusive unless arbitrary and unfounded in reason.''

The majority say that the churches, theaters, schoolhouses, courthouse, and city hall of the city afford ample space for any of the ordinary civic assemblies in pursuit of business or pleasure. I submit that the legislative finding to the contrary is not arbitrary or unfounded in reason.

The majority also say that an auditorium might be so managed that only the fortunate and prosperous portions of the community might avail themselves of its facilities. Shall we assume—and upon this assumption find—that the very purpose of the Legislature will be defeated by the adoption of such a policy on the part of the legal custodians of the building? Would it not be more consonant with the prerogatives of the court to assume that such a diversion from the contemplated purpose would not be attempted, but, if it were so, that the courts would enforce the rights of the public.

No such apprehension deterred the court in the case of *Matthews* v. *Kimball,* 70 Ark. 451, from upholding the ordinance of the city of Little Rock providing for the acquisition of a public park.

But it is said the opinion in that case was rendered by a divided court. So it was, but is the authority of the case lessened on that account? All the arguments here advanced against the right of the city to acquire an auditorium were there advanced against the right of the city to acquire a public park. In that case the opinion of the special chancellor, upholding the district, was adopted as the opinion of this court on the appeal. In that case the chancellor, among other things, said: "I think it would require strong evidence to show that a park like this one was not beneficial to the whole property in the city, and surely no court can say, as a matter of law, that the public park is not or will not be beneficial to the city." The opinion then quoted from the opinion of the Supreme Court of the United States in the case of *Wilson* v. *Lambert,* 166 U. S. 611, as follows: " 'Whatever tends to increase the attractiveness of the city of Washington as a place of permanent or temporary residence will operate to enhance the value of the private property situated therein and adjacent thereto.' "

In view of this statement by the highest court of the land, and the finding of the Legislature of this State that an auditorium may, in a certain case, become a local improvement, to be paid for by special assessments, shall we say that finding is arbitrary and demonstrably erroneous? The world moves. We are progressing. The luxury of yesterday is regarded as a necessity today. The schools and churches and buildings of that character may not afford such facilities for public assemblages as may now be required. Auditoriums have, as a matter of common knowledge, been erected in many of the more progressive communities, and have been paid for out of the public revenues, upon the theory that the cities possessing them are made more attractive as places of resi-

dence. If this be true, shall we say, as a matter of law, that there can in fact be no such enhancement of property values from the erection of an auditorium as to justify the imposition of special assessments to meet the construction cost?

In my opinion, there is at least enough doubt about the facts to allow the legislative finding to stand as not being arbitrary and demonstrably erroneous, and I therefore respectfully dissent from the conclusion of the majority.