[L. A. No. 3882. In Bank.—March 10, 1917.]

ELLEN THOMPSON et al., Appellants, v. C. H. HANCE, as Treasurer of the City of Los Angeles et al., Respondents.

MUNICIPAL CORPORATIONS—STREET IMPROVEMENT ACT—TUNNEL UNDER PUBLIC STREET—LOCAL ASSESSMENT DISTRICT.—A municipality has no authority, under the Street Improvement Act of March 18, 1885, commonly known as the Vrooman Act, and the amendments thereto, to construct a tunnel under a public street solely for purposes of public travel, or to assess the cost of such improvement upon a local district. The tunnels authorized by that act are those intended for drainage or sewer purposes.

ID.—TUNNEL NOT PART OF STREET.—A tunnel constructed under a public street, having no intermediate connection between its terminal portals with the surface above and not following the lines of the street throughout its entire length, is not a part of the street itself within the purview of the Vrooman Act.

ID.—CITY OF LOS ANGELES—INITIAL CONSTRUCTION OF TUNNEL—ASSESSMENT ON LOCAL DISTRICT NOT AUTHORIZED BY CHARTER.—The city of Los Angeles has no power, under section 2 of its charter, as amended in 1911 (Stats. 1911, p. 2059), to levy an assessment upon a local district in order to raise the money necessary for the initial establishment of a tunnel intended for purposes of public travel, as distinguished from the repair or improvement of an existing subterranean avenue.

ID.—BONDS ISSUED FOR TUNNEL ASSESSMENT—NOT VALIDATED BY BOND ACT.—The city being without power to levy such an assessment upon the property of a local district, bonds issued therefor are not validated by the validating clause of the Bond Act.

APPEAL from a judgment of the Superior Court of Los Angeles County. Willis I. Morrison, Judge.

The facts are stated in the opinion of the court.

Delmas, Imel & Banks, and Delphin M. Delmas, for Appellants.

Albert L. Stephens, City Attorney, Charles S. Burnell, Assistant City Attorney, C. R. Young, Marshall Stimson, F. C. Austin, and Swanwick & McCormick, for Respondents.

George W. Crouch, *Amicus Curiae,* on Petition for Rehearing.

MELVIN, J.—Plaintiffs appeal from a judgment entered after defendants' demurrer to the complaint had been sustained.

The action was instituted for the purpose of resisting payment of bonds which were sought to be made a lien upon property within a district assessed to pay for certain improvements on a portion of Hill Street, in the city of Los Angeles, and for the cost of the construction of a tunnel extending for a part of the distance traversed by it under a portion of said street. It appears from the averments contained in the complaint that on December 29, 1911, the city council of the city of Los Angeles adopted, and the mayor of said city approved, a certain ordinance declaring the intention "to improve a portion of Hill Street and to construct a public tunnel under a portion of said street, and determining that bonds shall be issued to represent the cost thereof, and declaring the work or improvement to be of more than local or ordinary public benefit and that the expense of said work shall be assessed upon a district."

By the first section of said ordinance it was declared that the public convenience required, and that it was the intention of the city council to order, certain work, including a tunnel, which was to pierce a hill some ninety feet in height intervening between the level portions of said Hill Street, at First Street and at Temple Street. Hill Street had been previously graded officially upon the part of it extending over the mound through which the tunnel was to pass.

Some of the sections of the ordinance related to the performance of street work on the official grade of Hill Street.

By the second section the contemplated work was declared of more than local or ordinary public benefit, and the council designated a district thus to be benefited, and by the next

section announced that certain described lots of land should be assessed to pay for the cost of that improvement.

The ordinance contained a direction to the city engineer to prepare a diagram; a finding that the cost of work along the line of the street to be improved would be more than fifty cents per front foot; a statement of the determination of the council to issue serial bonds (describing them in detail); and an announcement that the bonds were to be issued in accordance with the provisions of " 'An act to provide a system of street improvement bonds to represent certain assessments for the cost of street work and improvement within municipalities, and also for the payment of such bonds,' approved February 27th, 1893, and of all acts supplementary thereto or amendatory thereof." This by-law also contained provisions for posting and publication of notices of the work and of the passage of the ordinance itself.

The pleading recites in detail the proceedings following the adoption of the ordinance including the preparation and approval of the city engineer's diagram, and the other necessary steps done in conformity with " 'An act to provide for work upon streets, lanes, alleys, courts, places, and sidewalks, and for the construction of sewers within municipalities,' approved March 18, 1885, and the acts amendatory thereof," culminating in the letting, execution, and performance of a contract for the work. Then follow allegations of the acceptance of the work, the assessment by the board of public works to cover the cost of the improvement; the issuance of a warrant to the contractor's assignees; and the delivery to them, after the full expiration of thirty-five days, of certain street improvement bonds. Plaintiffs aver that they own property against which certain of these bonds have been issued; their refusal to pay the claims represented by said bonds; and the consequent threat and preparation to sell their land to pay the said bonds. They pray for the equitable relief suitable to prevent such results, and ask that the bonds be declared invalid and void. It is to be remembered also that the complaint contains an accurate description of the tunnel, and a statement that it was designed and is used solely for the passage of pedestrians and vehicles, being one of the most frequented thoroughfares of the city.

Appellants contend that the improvement—or that part of it represented by the tunnel—was made without authority,

and that the city was not clothed with power to levy a local assessment to pay for said tunnel. Respondents assert that ample authority is provided by the statute commonly known as the "Vrooman Act" (Stats. 1885, p. 147), and the amendments thereto, especially that of 1911 (Stats. 1911, p. 626). This law gives to the city council authority, whenever the public interest or convenience may require, to order "the whole or any portion, either in length or width, of any one or more of the streets, avenues, lanes, alleys, courts, places, boulevards, highways, crossings, intersections or public ways of any such city graded or regraded to the official grade, planked or replanked, paved or repaved, . . . and to order the construction or reconstruction therein of sidewalks, crosswalks, culverts, bridges, gutters, . . . and channels for sanitary and drainage purposes . . . hydrants and appliances for fire protection, tunnels, viaducts, conduits and subways, breakwaters, levees, bulkheads and walls of rock or other material to protect the same from overflow or injury by water . . . and the construction or reconstruction in, over or through property or rights of way owned by such city, of tunnels, sewers, ditches, drains, conduits and channels for sanitary and drainage purposes or either or both thereof, with necessary outlets . . . and to order any work to be done which shall be deemed necessary to improve the whole or any portion of such streets, avenues, sidewalks, lanes, alleys, courts, places or public ways or property or rights of way of such city."

It is evident to us that this statute does not, in and of itself, give to the city council the power to construct such a tunnel as the one described in the complaint in this case. Nor does the "Vrooman Act," or any one of its amendments, confer upon the city council authority to assess the cost of any such improvement upon a local district. The "Vrooman Act" is a street improvement act. The instrumentalities mentioned therein, and in the amendments thereto, are those used in connection with the improvement of streets. The word "tunnels" as employed in these statutes is not susceptible of the interpretation which respondents would give to it, namely, independent subterranean avenues for travel. The word is used in such manner as to leave no doubt that it has reference to tunnels for the purpose of draining surface streets. As first used in the above quotation the word appears in association with "viaducts, conduits" and other words ap-

plying to means of controlling surplus waters, and is followed by the expression "to protect the same from overflow or injury by water." The words "the same" refer to the streets and other public places enumerated in the first section of the act. It is plain that the "tunnels" here mentioned are mere auxiliaries to proper drainage of a street, square or other public place. Used a second time in section 2 of the "Vrooman Act" as amended in 1911, we find the word "tunnels" embraced in the part of the act giving power to the council for the construction over or through rights of way or property owned by the city of "sewers, ditches" etc. "for sanitary and drainage purposes or either or both thereof," indicating that the "tunnels" designated were to be mere instrumentalities for the elimination of storm waters or sewage. The closing words of section 2 of the act of 1911 quoted herein emphasize the fact that the statute is a *street improvement* act and *not one* for the authorization of the construction of a tunnel for the accommodation of part of the traffic of a great city. It is argued that as only commas are used in the section from which we have quoted it is possible to divorce the words "to protect the same from overflow," etc., from the enumeration of instrumentalities preceding that expression. If there were any possible doubt upon this subject it would be removed by an examination of another act of 1911 approved two days later than the amendment to the "Vrooman Act." This statute, sometimes known as "The Improvement Act" (Stats. 1911, p. 730), has a section 2 exactly like the one similarly numbered in the amendment to the "Vrooman Act," except that semicolons are used to divide the grouping of words. We find the following expressions therein punctuated as here indicated: "Pipes, hydrants and appliances for fire protection; tunnels, viaducts, conduits and subways, breakwaters, levees, bulkheads and walls of rock or other materials to protect the same from overflow or injury by water." This punctuation amounts almost to a demonstration that the legislative intent did not extend to the conferring upon city councils of power under the "Vrooman Act" to construct tunnels for purposes of public travel. In the case of *Gassner* v. *McCarthy*, 160 Cal. 82, [116 Pac. 73], this court held that provisions of the charter of the city and county of San Francisco, substantially identical with those of the "Vrooman

Act,'' did not authorize a district assessment to meet the cost of a tunnel.

It is equally clear that the tunnel here under discussion does not come within the purview of the ''Vrooman Act'' as a mere part of the street itself. Respondents cite *Sears* v. *Crocker,* 184 Mass. 586, [100 Am. St. Rep. 577, 69 N. E. 327], as authority upon the proposition that a subway, under certain conditions, may be regarded as legitimately a part of a public street. It is true that the supreme court of Massachusetts in that case decided that no additional servitude was taken by the city of Boston in constructing a subway below the surface of a public street, but the facts before the court in that case differed greatly from those presented by this record, as a brief quotation from the opinion of the learned chief justice of the supreme court of Massachusetts will indicate:

''In the present case the travel which is being provided for is from place to place within the city. There are stopping places on the subway at convenient points. In that respect it is different from a tunnel designed only or chiefly for travel for long distances. The new method is a substitution in part of a subterranean use of the streets for a use of their surface for the same general purpose. It is impracticable to have direct communication between the premises of abutters and the cars in the tunnel, but by going a short distance access to them may be had from any place. We are of opinion that this use of the streets is within the purposes for which the lands were taken and that no additional servitude is created by it.''

The tunnel we are dealing with is one having no intermediate connection between its terminal portals with the surface above, and moreover it does not follow the lines of Hill Street throughout its entire length. In that respect it is more unlike a part of the street than the Stockton Street tunnel in San Francisco, of which Mr. Justice Sloss in delivering the opinion of this court in *Mardis* v. *McCarthy,* 162 Cal. 94–103, [121 Pac. 389], said: ''We doubt whether the construction of a tunnel 'in or under' a street is fairly to be regarded as a repair or improvement of the street.''

It being clear that the general statutes relating to street improvements are not sufficient in and of themselves to uphold the assessment attacked by plaintiffs, we will examine the argument of respondents to the effect that in the charter

of the city of Los Angeles is found the authorization and the conferring of power which supports the proceedings taken to construct the Hill Street tunnel, and to assess the cost thereof upon a benefited district. Prior to the passage of the ordinance by which the construction of the Hill Street tunnel was ordered, the charter of Los Angeles had been amended. By section 2 of the amended charter (Stats. 1911, p. 2059), it is provided that "The city of Los Angeles, in addition to any other powers now held by, or that may hereafter be granted to it under the constitution or laws of the state, shall have the right and power." These words are followed by the enumeration of many specific rights and powers. The eleventh subdivision gives to the city power "To acquire by purchase, lease, condemnation or otherwise, or to construct, and to own, maintain, equip and operate tunnels, conduits, viaducts and subways; to regulate and control the use thereof, and to fix and collect charges for such use." The thirteenth subdivision is in the following language:

"To establish, lay out, open, extend, widen, narrow, or vacate, pave or repave, or otherwise improve streets, lanes, alleys, boulevards, crossings, courts, and other highways and public places." The nineteenth is as follows: "To levy and collect, or cause to be levied and collected, assessments upon property according to frontage, or upon property in districts according to benefits, to pay for the improvement of streets, or for the construction in any public street, alley or other public place, or in any right of way owned by the city, of sewers, drains, water or gas mains, and lines and conduits for transmitting electric current, and other pipes, mains, lines and conduits, or for other public improvements." The thirty-ninth subdivision of section 2 provides that "The powers conferred by this article shall be exercised by ordinance, except as otherwise provided in this charter."

Respondents assert that these provisions give to the city council the right to construct tunnels, to assess districts to pay for such improvements, and to proceed to do these things either by power conferred by general statute or by authority given by virtue of the charter. Examining these parts of the charter we fail to find any authority in the city to levy an assessment upon a district for the cost of such construction. Conceding that subdivision eleven gives the power to construct a tunnel such as this for the use the public, and that sub-

division thirteen extends such power to include the subsequent improvement and repair of a tunnel, we find nothing in subdivision nineteen or in any other part of the charter authorizing the assessment of a district for the purpose of raising the amount necessary for the initial establishment of a tunnel, as distinguished from the repair or improvement of an existing subterranean avenue. The words "or for other public improvements," must be construed in connection with the other parts of the subdivision which relate to the improvement of public streets, or the construction in public streets or places of conveniences for sanitation, drainage, and the transmission of water, heat, electricity, gas and the like. To construe the words "for other public improvements," as conferring a power to assess for a tunnel of this sort, would be to wrench them from their context, and ignoring the rule of *ejusdem generis* to give them a meaning at variance with the obvious legislative intent. It is difficult to believe that, in a provision intended by the framers of the charter to confer in terms the right to assess a district for the improvement of existing streets, the higher power to raise money for the construction of a costly tunnel would be given in the general phrase "for other public improvements."

Respondents cite *Mardis* v. *McCarthy*, 162 Cal. 94, [121 Pac. 389], as sustaining their claim of authority under the charter, but the provisions of the charter of the city and county of San Francisco which we reviewed in that case were explicit, and by them the board of supervisors was clearly authorized to order the construction of tunnels and to provide therefor by district assessments. In that case, and in the later case of *Hayne* v. *City and County of San Francisco, ante,* p. 185, [162 Pac. 625], we were dealing with a charter which in its enumeration of the powers of the supervisors with reference to tunnels went far beyond the provisions of the charter of Los Angeles in respect to the city council. Neither of those decisions supports the position of respondents in this case.

Respondents contend that the validating clause of the Bond Act makes the issuance of the bonds conclusive of the regularity of the proceedings prior thereto, but this question is not involved. The city council lacked power to levy the assessment on the property in the designated district. Therefore the method employed is not material.

It follows that the judgment must be reversed and it is so ordered.

Sloss, J., Henshaw, J., Lorigan, J., Shaw, J., Lawlor, J., and Angellotti, C. J., concurred.

Rehearing denied.