[Civ. No. 3984.    Second Appellate District, Division Two.—September 27, 1922.]

FEDERAL CONSTRUCTION COMPANY (a Corporation), Petitioner, v. H. W. ENSIGN, as Superintendent, etc., Defendant.

[1] MUNICIPAL CORPORATIONS — SEWAGE DISPOSAL PLANT — PLACE OF CONSTRUCTION.—It it a matter of common knowledge that, though sewers are usually laid in streets, the outlets, flush tanks, septic tanks, and other similar appurtenances which take care of the sewage flowing through and from sewers are seldom, if ever, constructed in the streets.

[2] ID.—CONSTRUCTION OUTSIDE OF CORPORATE LIMITS—AUTHORITY OF MUNICIPALITY — IMPROVEMENT ACT OF 1911.—Under the Improvement Act of 1911 (Stats. 1911, p. 730), which empowers a city council to construct sewers in streets or in, over, or through property or rights of way owned by the city with outlets, flush tanks, septic tanks, connecting sewers and other appurtenances, a municipal corporation is authorized to construct a sewage disposal plant on property owned by it outside of the city limits, since such plants are not independent structures, but are accessories used in connection with and as an indispensable constituent of the entire municipal system, of which only the sewers, as a general rule, are laid in the streets.

[3] STREET LAW—ASSESSMENT DIAGRAM—SHOWING LOCATION OF LOTS WITHIN DISTRICT—CONSTRUCTION OF ACT OF 1911.—Subdivision 10 of section 20 of the Improvement Act of 1911, providing that the assessment diagram shall show each parcel of land, the area in square feet, and the relative location of the same to the work proposed to be done, "all within the limits of the assessment district," does not require the diagram to show that the *work* is within the limits of the assessment district.

[4] ID. — FOUNDATION OF LOCAL ASSESSMENTS — SPECIAL BENEFITS. — Special benefits to the property to be assessed, that is, benefits received by it in addition to those received by the public at large, is the equitable and just foundation upon which local assessments rest, and no assessment can be made upon any land on any principle other than that of special benefits actually or presumptively received.

[5] ID.—LOCAL ASSESSMENT—ESSENTIALS.—In order to justify a local assessment based on the theory of benefits the improvement must be

4.   Necessity of special benefit to sustain assessments for local improvements, notes, 14 L. R. A. 755; L. R. A. 1918E, 190.

a public one and it must confer an especial and local benefit, actual or presumptive, upon the property which is to be assessed.

[6] ID.—TEST OF SPECIAL BENEFITS.—There is no fairer test of special benefit received than that which determines the existence and amount of such benefit by the effect of the improvement upon the market value of the property to be assessed.

[7] ID.—DETERMINATION OF AMOUNT OF BENEFITS—POWER OF ASSESSING AUTHORITIES.—If from the nature of the improvement it can be seen that the lots to be assessed are susceptible of some substantial benefit from it, the question of the extent of the benefit received is one which, in the absence of fraud, gross injustice, or demonstrable mistake, rests peculiarly in the determination of the assessing authorities, and their action will not be interfered with by the courts.

[8] MUNICIPAL CORPORATIONS — CONSTRUCTION OF SEWAGE DISPOSAL PLANT OUTSIDE OF CITY—CITY AS SINGLE ASSESSMENT DISTRICT.—Where a municipal corporation, in order to construct a sewage disposal plant on land owned by it two miles outside of the city limits, established an assessment district coextensive with the area of the municipality and made the expense of the improvement chargeable upon substantially all of the lots and lands within the city, excepting the streets and other public highways therein and such lands as were owned by the county, the city or the school board, and it appeared that every property owner would be specially benefited by the proposed improvement, the enterprise was not deprived of the character of a local improvement so that the work could not be paid for by special assessment.

[9] ID.—LOCAL ASSESSMENTS—LIMITATIONS.—The only limitations upon the power of local assessments are that the improvement shall be a public one, that it shall confer an especial benefit upon the property to be assessed, and that the apportionment of the assessments shall be made upon some basis that is uniform and free from unjust discrimination.

APPLICATION for a Writ of Mandate to compel the issuance of a contract for municipal sewer work. Granted.

The facts are stated in the opinion of the court.

W. E. Simpson and Gallaher, Simpson & Hays for Petitioner.

Arthur M. Ellis for Defendant.

---

8. Property subject to special sewer assessment, note, **Ann. Cas.** 1915D, 384.

FINLAYSON, P. J.—Petitioner, to whom the board of trustees of the city of Dinuba awarded a contract for the performance of certain public work, brings this proceeding in *mandamus* to compel respondent, as the city superintendent of streets, to execute the contract.

The city of Dinuba, a municipal corporation of the sixth class, is provided with a complete sewer system. It owns a parcel of land outside of and distant about two miles from its corporate limits, on which it has constructed a sewage disposal plant, consisting of a septic tank and its appurtenances, constructed some years ago for the disposal of the city sewage. That part of the municipal sewer system which lies within the corporate limits of the city is connected with the septic tank by a main sewer line, owned and maintained by the city, and extended to the outside parcel of land on which the septic tank is situated.

So greatly has the population of the municipality increased since the construction of the present septic tank, that the existing sewage disposal plant, of which the tank is the principal constituent, is now wholly inadequate—so much so that the sewage from the city overflows the septic tank and the effluent therefrom flows into and contaminates the water in certain irrigating ditches which are being used to irrigate near-by farms, orchards, and vineyards, thus creating a nuisance which menaces the health of the surrounding community. So serious is the situation that the farmers and others whose irrigating systems are now being polluted by the effluent from the city's present insufficient sewage disposal plant threaten to and will enjoin the city from using the existing inadequate septic tank unless new and adequate tanks be immediately constructed by the city. Should the city be thus restrained it will be practically impossible for any of its inhabitants to make use of any part of the city's sewer system. To meet so grave a situation the city board of trustees proposes to construct on the parcel of land two miles distant from the city limits— the land on which is now located the present inadequate septic tank—a complete sewage disposal plant, consisting of reinforced hydraulic concrete settling tanks, with outlets, connecting sewers, conduits, and appurtenances. In other words, the proposed work is, as stated in petitioner's brief, "the reconstruction of the present sewage disposal

plant, in order that adequate provision may be made for meeting the requirements of the city.'' With this purpose in view, the city officials inaugurated proceedings under the Improvement Act of 1911 (Stats. 1911, p. 730). That act makes the cost of the work authorized thereby payable by special assessments, assessed either upon the lots and lands fronting the improvement, in proportion to frontage, or, in proportion to benefits received, upon the lots and lands within an assessment district to be described in the resolution of intention. In the instant case, the board of trustees, deeming the contemplated improvement of more than local or ordinary public benefit, established an assessment district coextensive with the area of the municipality, and sought to make the expense of the improvement chargeable upon substantially all of the lots and lands within the city, excepting the streets and other public highways in the city and such lands as are owned by the county, the city or the school board.

The proceedings thus inaugurated by the city trustees progressed through the various legal stages provided by the Improvement Act of 1911 to and including the award of the contract to petitioner as the successful bidder. Respondent, upon whom, as the superintendent of streets, the statute imposes the duty of entering into a formal written contract with every successful bidder, refuses to enter into any contract with petitioner, placing his refusal on the ground that the Improvement Act of 1911 does not contemplate work of the character here proposed. Hence this *mandamus* proceeding.

Respondent's first point is that work to be done on property lying outside of a municipality's corporate limits, even though such outside property be owned by the city, is within neither the letter nor the spirit of the act.

Section 2 of the Improvement Act of 1911 (omitting parts not essential to the question in controversy) reads: ''Whenever the public interest or convenience may require, the city council is hereby authorized and empowered to order the whole or any portion or portions, either in length or width of any one or more of the streets, avenues, lanes, alleys, courts, places or public ways of any such city graded or regraded to the official grade, . . . and to order the construction or reconstruction therein of sidewalks

. . . sewers . . . conduits and channels for sanitary and drainage purposes, . . . with outlets, cesspools, manholes, catch basins, flush tanks, septic tanks, connecting sewers . . . and other appurtenances; . . . and the construction or reconstruction in, over or through property or rights of way owned by such city, of . . . sewers . . . for sanitary and drainage purposes, . . . with necessary outlets, cesspools, manholes, catch basins, flush tanks, septic tanks, connecting sewers . . . and other appurtenances, and to order any work to be done which shall be deemed necessary to improve the whole or any portion of such streets, avenues, sidewalks, lanes, alleys, courts, places, or public ways or property or rights of way of such city.''

As will be noticed, the act declares that the legislative body of any city is authorized to order ''the whole or any portion . . . of any one or more streets . . . graded . . . and to order the construction or reconstruction *therein* [i. e., in such streets] of sewers . . . *with* outlets, . . . flush tanks, septic tanks, connecting sewers . . . and other appurtenances.'' The act does not say that the ''outlets, flush tanks, connecting sewers . . . and other appurtenances'' which may be constructed or reconstructed *with* the sewers shall be constructed or reconstructed in the streets, nor even that they shall be constructed within the city's corporate limits. On the contrary, the legislature, in seeming recognition of the fact that every municipality may be confronted with its own peculiar engineering problems respecting the disposal of its sewage, has wisely refrained from saying that the outlets, flush tanks, etc., which are authorized to be constructed ''with'' the sewers shall be constructed in any particular place or locality. Indeed, the legislature, recognizing, apparently, that it often is necessary to leave to the local authorities a wide latitude of discretion respecting the place or places where the outlets, flush tanks, etc., and even the sewers themselves, may be constructed, has specifically declared in this same section of the act that the city authorities shall have the power to order the construction or reconstruction of sewers, with necessary outlets, flush tanks, etc., ''in, over or through property or rights of way owned by such city,'' without in anywise attempting to place any restriction upon the place

or places where such city-owned property or rights of way shall be located.

[1] It is a matter of common knowledge that, though the sewers are usually laid in streets, the outlets, flush tanks, septic tanks, and other similar appurtenances which take care of the sewage flowing through and from sewers are seldom, if ever, constructed in the streets. Indeed, we cannot imagine a case where scientific engineering would sanction the construction of a settling tank or a septic tank in a street of such a municipality as the city of Dinuba, for the purpose of taking care of the sewage flowing from the city's entire sewer system. The construction of such outlets, flush tanks, septic tanks, etc., on lands lying outside of the city limits is not at all uncommon in this state. And when the act declares that city councils may construct sewers in streets, or in, over, or through property or rights of way owned by the city, *with* outlets, flush tanks, septic tanks, and other appurtenances, it undoubtedly contemplates the possible, if not probable, construction of such adjuncts to the city's sewer system as flush tanks, etc., upon any convenient and appropriate parcel of land or right of way owned by the city, even though such land or right of way be located without the city's corporate limits.

[2] Counsel for defendant says that the Improvement Act of 1911 is essentially a "street improvement act," and that, therefore, no improvement may be made of property situated outside the city's corporate limits. The object and true scope of such work as that under consideration here is not the improvement of the land upon which the proposed settling tanks, etc., are to be constructed. The proposed improvement is for the benefit of the inhabitants of the city and their lots and lands. Existing conditions are such that it is absolutely necessary that the present sewer system shall have a larger and a more adequate sewage disposal plant. To make the present sewer system of any real benefit to the lot owners and other inhabitants of the city of Dinuba, a larger sewage disposal plant must be constructed. No natural outlet for the city's sewage can be found within the city's corporate limits. Nor does it appear that the municipality owns any property within its corporate limits that is suitable for the erection thereon of an adequate sewage disposal plant; and if the city does

not own any such property within its boundaries, then obviously it is absolutely requisite that its sewer system be extended some distance beyond the city limits and there be connected with suitable flush tanks, etc., in order properly to dispose of the city's sewage. But it does not follow, because that is the case, that the assessments which may be made to pay for this work will be made for an improvement outside of the city. The construction of larger and more suitable flush tanks on the city's outside property is not an improvement for that property, but is one for the benefit of the inhabitants of the city and the lots and lands therein—an improvement rendered necessary by reason of the geographical condition of the land upon which the city is located. The power given by the Improvement Act of 1911 to construct sewers within the incorporated limits of the city would be a useless one indeed if the system of sewers within the city could not be connected with some outlet or with some sewage disposal plant; and should we hold that this act does not give the city power to extend any part of the municipal sewer system beyond the city's corporate limits, when it is necessary to do so in order to obtain an outlet or to connect with a suitable sewage disposal plant, such a narrow interpretation would defeat the obvious intention of the legislature in passing the statute. In *Shreve* v. *Town of Cicero*, 129 Ill. 226 [21 N. E. 815], *Cochran* v. *Village of Park Ridge*, 138 Ill. 295 [27 N. E. 939], and *Maywood Co.* v. *Village of Maywood*, 140 Ill. 216 [29 N. E. 704]— cases arising under local improvement acts—the Illinois supreme court, having occasion to consider a similar question, held that where no suitable outlet for a sewer can be found within the municipality, its extension to land beyond the city's corporate limits is for the benefit of the sewers within the city and for the exclusive use and benefit of the municipality and its inhabitants, and is, therefore, within the purview of the statute. To the same effect is *Mullins* v. *City of Little Rock*, 131 Ark. 59 [L. R. A. 1915B, 262, 198 S. W. 262].

Respondent cites us to *Thompson* v. *Hance*, 174 Cal. 572 [163 Pac. 1021], a case arising under the Vrooman Act (Stats. 1885, p. 147) and involving a city's power under that statute to construct tunnels for the use of pedestrians

and vehicular travel. In that case the court held that when the Vrooman Act speaks of such instrumentalities as tunnels, etc., it means such as are "used in connection with the improvement of streets," and that such tunnels as are intended to be independent subterranean avenues for travel, and not mere auxiliaries for the proper drainage of surface streets, are not such *street improvements* as are provided for by the Vrooman Act. There is nothing in that case which conflicts with the views expressed herein respecting the construction of the Improvement Act of 1911. In the first place, as was pointed out by the court in the Thompson case (174 Cal. 576 [163 Pac. 1021]), there is a material difference between the punctuation which divides the clauses of the Vrooman Act and that which separates the corresponding clauses of the act under consideration here. In the next place, the purpose of the Vrooman Act, as declared in its title, is to provide for work done upon "streets, lanes, alleys, courts, places and sidewalks and for the construction of sewers within municipalities"; whereas, according to the title of the act here under consideration its purpose is not alone to provide for work "in and upon streets, avenues, lanes, alleys, courts, places and sidewalks within municipalities," but also to provide for work "upon property and rights of way owned by municipalities," and, as we have pointed out, the act places no limitation upon the location of such city-owned property or rights of way. Finally, there is a vast difference between separate and independent structures, such, for example, as subterranean tunnels for travel, and auxiliary plants or other appurtenances, such as settling tanks intended for the disposal of a city's sewage. Such sewage disposal plants are not independent structures, but are necessary and essential ancillary adjuncts—accessories used in connection with and as an indispensable constituent of the entire municipal sewer system, of which only the sewers, as a general rule, are laid in the city's streets. And though such sewage disposal plants be situated outside of the city's corporate limits, they still are but adjuncts of, or, as the act says, "appurtenances" to, the sewers which are laid in the streets.

[3] By subdivision 10 of section 20 of the act under consideration it is provided that the assessment diagram

"shall show each separate lot, piece or parcel of land, the area in square feet of each of said lots, pieces or parcels of land and the relative location of the same to the work proposed to be done, all within the limits of the assessment district." Because of this provision it is claimed that, since the work in the instant case is to be done outside of the assessment district, the statute cannot be followed, and that, therefore, it was not intended to cover such a case as this. The argument is based upon the assumption that the language just quoted requires the assessment diagram to show that the *work* is "within the limits of the assessment district." We do not so construe this provision of the act. As we understand it, it means that all the lots and parcels of land within the assessment district, and their relative location to the work to be done, shall be shown on the assessment diagram. In order to show the relation of the work to the lots to be assessed it is not necessary that the work to be done, as well as the lots, shall be within the assessment district.

For the foregoing reasons, we are of the opinion that respondent has shown no basis for his contention that the Improvement Act of 1911 does not embrace such work as is contemplated by these improvement proceedings.

This brings us to a consideration of respondent's second point, which is that, by reason of certain constitutional limitations upon the power to levy special assessments to pay for local improvements, the reconstruction and enlargement of a sewage disposal plant, intended to take care of all the sewage flowing through and from a city's entire system of sewers, cannot be made the subject of a local improvement, to be paid for by special assessments on all the privately owned lots and parcels of land situated within the municipality.

It is not claimed that special assessments may not be levied to pay the cost of reconstruction work as such. Nor could such claim be maintained if made. The legislature, in the act under consideration, has expressly authorized the construction or *reconstruction* of sewers, septic tanks, etc. That the legislature possesses the power to authorize reconstruction work is no longer a debatable question in most of the jurisdictions of this country. Power to make local improvements is a continuing one which may be exercised

from time to time as the needs of the municipality may require, and the city authorities, not the courts, are to judge of the necessity therefor. According to the clear weight of authority, if such an improvement combines the requirements of benefit to the public at large and exceptional local benefit to the property which is sought to be assessed, the same considerations which make it proper to levy local assessments for the original improvement make it equally proper to levy such assessments for any improvements to take the place of the original one. (25 R. C. L., p. 103; 1 Page and Jones on Taxation by Assessment, secs. 380, 381.) What we understand respondent to claim is that in this case the reconstruction work is of such a character that it is not of special benefit to the lots or lands within the city of Dinuba, but is of general benefit to the community at large, and, therefore, should be paid for by general taxation and not by special assessments.

[4] Special benefits to the property to be assessed, that is, benefits received by it in addition to those received by the public at large, is the equitable and just foundation upon which local assessments rest; and under our system of government no assessment can be made upon any land on any principle other than that of special benefits actually or presumptively received. [5] The elements which an improvement must possess in order to justify a local assessment based on the theory of benefits are certainly two in number, and possibly three. The first is that the improvement must be a public one; that is, it must be one which confers a general benefit upon the public at large, and which, therefore, the public, acting through its government, may construct without the consent of the particular individuals affected. An improvement which lacks this element is essentially a private improvement; and no matter how useful or advantageous it may be to the owners of private property, the public cannot compel its construction, nor can it pay for it by funds raised by the exercise of the sovereign power of taxation. (*Spring Street Co. v. City of Los Angeles,* 170 Cal. 30 [L. R. A. 1918E, 197, 148 Pac. 217]; 1 Page and Jones on Taxation by Assessment, sec. 283.) The second element essential to a valid local assessment is that the improvement must confer an especial and local benefit upon the property which is to

59 Cal. App.—14

be assessed. It is possible that it will suffice if, from the nature of the work, the property can be *presumed* to have received an especial benefit. (See 4 Dillon on Municipal Corporations, 5th ed., sec. 1440.) Unless, however, there be some local benefit, actually or presumptively received, the improvement may be public in character, so that the expense thereof may be borne by general taxation, but a local assessment, levied on the basis of benefits, cannot be made therefor; since the underlying principle of such assessments is that the improvement, aside from the mere general advantage resulting to the community at large, will result in some special benefit to the particular lot owners whose lands are assessed—a special benefit to the assessed lands in which the general public does not participate. (1 Page and Jones on Taxation by Assessment, sec. 284.) It is, however, no objection to the validity of an assessment that the improvement benefits the public, provided it also confers an especial local benefit upon the property to be assessed. Improvements of this sort necessarily must have a dual aspect—an aspect of general benefit to the public as well as one of peculiar local benefit to the lot owners. To invalidate the assessment the general public benefit must be the only result of the improvement. A third element which is insisted upon in some jurisdictions is that of permanency. (1 Page and Jones on Taxation by Assessment, sec. 285.) In the instant case we are concerned only with the second element—that which demands that the improvement shall confer on the assessed property an actual, or at least a presumptive, local and especial benefit.

Whether all of the privately owned lots in the city of Dinuba will be specially benefited by the proposed improvement, and whether it is a "local improvement," as that term is generally understood when considered in connection with special assessments, are questions which, it must be confessed, are of serious concern; for, so far as we are advised, the appellate courts of this state never have had occasion to deal with an improvement of the nature of that which confronts us here. However, the guiding principles are few and well established, and we are convinced that their proper application to the facts of this case must lead to a decision favorable to the exercise of the power to

levy special assessments to pay for the proposed reconstruction of this sewer disposal plant.

As we view the problem, it presents two aspects: (1) Is the nature of the work such that we can see that it is possible for it to especially benefit all the privately owned lots and parcels of land within the confines of the city, in addition to any general benefit which may result to the public? (2) Does the fact that the assessment district embraces all of the privately owned real property within the city necessarily deprive the enterprise of the character of a "local improvement"?

Addressing ourselves now to the first question: We think it clear that not only will the lot owners be specially benefited by the proposed improvement, but that the benefits to be derived by them as lot owners will exceed any that the general public will receive—much more so, in fact, than in the case of the improvement of a public street or other highway. Where a street is paved or otherwise improved, the beneficial use thereof may be enjoyed, not only by the owners of lands within the city, but by the nonowners of real property in the city and likewise by the citizenry of the state generally. It is evident, therefore, that where a street or other highway is paved or otherwise improved, the benefits accruing to the lot owners are much less, in proportion to the advantages accruing to the general public, than is the case here. Practically all of the benefits to be derived from the enlargement of a city's sewage disposal plant will redound to the lot owners of the city, as lot owners, and little, if any, will be received by the general public. With but few exceptions it is the inhabitants of a municipality who enjoy the benefits which are derivable from a city sewer system designed to carry off the sewage from the various residences, factories, buildings, and other structures within the municipality. Practically every inhabitant of a city either is the owner of the land on which he resides or on which he pursues his vocation, or he is the tenant of the owner, or is the agent or servant of such owner or of such tenant. And since it is the inhabitants who make by far the greater use of a city's sewer system, it is to them, as lot owners or as tenants, or as the servants or agents of such lot owners or tenants, that the advantages of actual use will redound. But this

advantage of use means that, in the final analysis, it is the lot owners themselves who will be especially benefited in a financial sense. If the inhabitant who makes use of the city's sewer system happens to own the lot which he occupies, then, manifestly, he will be directly and immediately benefited as a lot owner. He will be benefited as an inhabitant, in that he will enjoy the use of the sewer, and, as a lot owner, he will be benefited in a financial sense, in that the value of his lot will be enhanced by reason of the sewer facilities. And the lot owners who, instead of occupying their lots, rent them to others, will also, as lot owners, be directly and immediately benefited financially by a municipal sewer system. For, if the inhabitants using the city sewer system be tenants, or the agents or servants of tenants, then the landlords to whom the tenants pay the rent will be benefited financially as land owners. It seems clear that the market value of each and every parcel of real estate within a city's confines would be much less without than with a municipal sewer system, and that the market value of each and every parcel of land within the city must be substantially enhanced if there be a complete sewer system adequate to care for all of the city sewage.

[6] There is no fairer test of special benefit received than that which determines the existence and amount of such benefit by the effect of the improvement upon the market value of the property to be assessed. (2 Page and Jones on Taxation by Assessment, sec. 653. See, also, *Doyle v. Austin,* 47 Cal. 359.) If, then, the farmers whose lands are now being polluted by the effluent from the present sewer system shall carry out their threat to enjoin the use of that system on the ground that its present use constitutes a nuisance, thus making it impossible for the inhabitants of the municipality to make any substantial use of any of the sewers within the city's confines, the result will be that the whole existing sewer system will become useless. Should such a calamity befall the inhabitants of the city of Dinuba, the market value of all the real properties within the city necessarily would be considerably reduced. On the other hand, should the city's sewage disposal plant be reconstructed and enlarged in the manner contemplated by the proposed improvement, the market

values of all the lands within the city, barring extraneous causes, must necessarily be kept at their present level, if not actually and substantially enhanced. But whether the improvement shall tend to enhance the land values or merely to keep them at their present level, the lot owners, as lot owners, will necessarily receive direct and immediate special benefits in which the other members of the community do not and cannot participate.

In view of these considerations, it is manifest that the nature of the work is such that we cannot say that it is impossible to confer any special or peculiar benefit on the lots to be assessed. On the contrary, it is obvious that each and every lot within the confines of the municipality will enjoy a special benefit not shared by the general public. This being so, the courts, in the absence of glaring injustice, or of fraud or mistake on the part of the city trustees, will not inquire into the *quantum* of special benefit which will accrue to the lot owners.

[7] The established rule in this state is that if, from the nature of the improvement, it can be seen that the lots to be assessed are susceptible of some substantial benefit from it, the question of the extent of the benefit received is one which, in the absence of fraud, gross injustice, or demonstrable mistake, rests peculiarly in the determination of the assessing authorities, and their action will not be interfered with by the courts. The right to make assessments of this character is referable, in a general way, to the sovereign power of taxation. But it would be inconsistent with the proper exercise of that power, and would tend to a manifest embarrassment of the public in the prosecution of these public improvements, if, on each assessment, the lot owner were entitled to have the question judicially determined whether or not he would be benefited by the proposed improvement in an amount commensurate with the assessment on his lot. This doctrine is forcefully stated by the Oregon supreme court as follows: "It is asserted with substantial unanimity and great clearness by the courts in this country, as well as by textwriters of erudition and learning, that, unless the nature of the case precludes it, the power to determine the confines of a taxing district for any particular burden is purely one of legislative discretion, and that the question

of benefits accruing by reason of improvements contemplated is regarded as one of fact, which the legislature is always presumed to have considered and settled by the enactment. . . . As has been indicated by some of the foregoing references to the authorities, the legislature may, instead of fixing and prescribing the taxing district itself, refer the matter to commissioners or local boards or bodies for their ascertainment and determination; and in such case the substituted bodies possess and exercise legislative functions, and their action must be deemed as conclusive upon the subject as if the legislature had exercised the authority directly. (Cooley on Taxation, 2d ed., 640.)'' (*King* v. *Portland,* 38 Or. 402 [55 L. R. A. 812, 63 Pac. 2].) The same doctrine is announced by the United States supreme court in *Spencer* v. *Merchant,* 125 U. S. 356 [31 L. Ed. 763, 8 Sup. Ct. Rep. 921], *Parsons* v. *District of Columbia,* 170 U. S. 45 [42 L. Ed. 943, 18 Sup. Ct. Rep. 521], and *Williams* v. *Eggleston,* 170 U. S. 311 [42 L. Ed. 1047, 18 Sup. Ct. Rep. 617, see, also, Rose's U. S. Notes], and has been repeatedly enunciated by our own supreme court. Thus, in *Hadley* v. *Dague,* 130 Cal. 220 [62 Pac. 504], Mr. Justice Harrison, speaking for the court, said: ''The principle upon which the expense is charged upon the property in that district is that that property has received a particular benefit. But, as was said by Mr. Justice Temple in *Lent* v. *Tillson,* 72 Cal. 404, 428 [14 Pac. 71]: 'The benefit is not the source of the power.' Nor does the validity of the assessment depend upon the ability to show that the property assessed was exceptionally benefited by the amount of the assessment or received that particular amount of benefit. Courts will uphold an assessment made upon such legislative authority, even though the benefits are not shown to be identical with the burden.'' (See, also, *Larsen* v. *San Francisco,* 182 Cal. 8, 9 [186 Pac. 757].)

[8] It only remains to consider whether the fact that all the lands within the city will be benefited deprives the enterprise of the character of a ''local improvement,'' so that the work may not be paid for by special assessment. By establishing an assessment district coextensive with the city, the city's board of trustees must be deemed to have proceeded upon the theory that practically all of the privately owned lands within the municipality will be specially

benefited by the proposed improvement. The question which presents itself, therefore, is this: Does an improvement cease to be "local" when its benefits extend to all the lands within the confines of the municipality? This question has been variously answered. In some states, notably in Illinois, it is held that if the benefit be shared by all the lands in the municipality, the improvement cannot be regarded as local. Thus, in *Village of Morgan Park* v. *Wiswall*, 155 Ill. 262 [40 N. E. 611], it was held that an improvement which is of general benefit to all the real property in the city is not a "local improvement," within the meaning of the Illinois constitution. Other states, adopting what we may appropriately term the Arkansas doctrine, hold that the fact that the benefits of the improvement extend to all the lots and lands throughout the city does not of itself deprive the enterprise of the character of a "local improvement," and that, therefore, an assessment district may be made of the entire city and all the privately owned lots therein may be assessed to pay for the improvement. (*Crane* v. *City of Siloam Springs*, 67 Ark. 36 [55 S. W. 955]; *Matthews* v. *Kimball*, 70 Ark. 451 [66 S. W. 651, 69 S. W. 547]. See, also, in this connection, *Shibley* v. *Fort Smith etc. District*, 96 Ark. 410 [132 S. W. 444]; *Mullins* v. *Little Rock, supra; Johns* v. *Road Improvement District*, 142 Ark. 73 [218 S. W. 389]; *Solomon* v. *Wharf Improvement Dist.*, 145 Ark. 126 [223 S. W. 385]; *Bennett* v. *Johnson*, 130 Ark. 507 [197 S. W. 1148]; *Minnesota etc. Improvement Co.* v. *Billings*, 111 Fed. 972 [50 C. C. A. 70]; *Kane* v. *Wedell*, 54 Cal. App. 516 [202 Pac. 340]; *McGarry* v. *Ellis*, 54 Cal. App. 622 [202 Pac. 463].)

Though it may be difficult to lay down a test which shall have an unvarying application to every state of facts, it seems clear that there can be no sound reason why the magnitude of the project or the extensiveness of the area to be assessed should have any decisive bearing on the question, provided the included area will derive a special benefit apart from that enjoyed by the public as a whole. In other words, the size of the assessment district presents only a question of degree in the enjoyment of the special benefits, and is not necessarily decisive that the benefit is general in its results. (*Bennett* v. *Johnson, supra.*) In

*Johns* v. *Road Improvement District, supra,* the Arkansas supreme court says: "We have never decided that the mere inclusion of the whole of a county in a district is void. On the contrary, we have held that the whole of a county may be included, if the improvement is a single one and affects all the lands of the county. . . . The test is not the extent of the area included in the district, but the singleness of the authorized improvement and the relationship to it of the included territory as to benefits to accrue from the improvement."

Aside from such general inhibitory provisions as, for example, are to be found in the Bill of Rights, the California constitution contains no direct and express limitation upon the power to levy special assessments for local improvements. The legislative will in this state is, therefore, supreme, so far as any direct constitutional limitation is concerned. In this respect our constitution differs from that of Illinois. In the Illinois constitution of 1870 it is expressly declared that the legislature may vest the corporate authorities of cities, towns, and villages with power "to make *local* improvements by special assessment" (article IX, sec. 9). This provision of the Illinois constitution has been held by the courts of that state not only to be a grant of the power to authorize special assessments as therein set forth, but also to be an inhibition prohibiting the legislature from conferring the power in any way other than as therein set forth. [9] In California the only limitations upon the power, or, more accurately speaking, the rules which the municipal authorities must observe, are that the improvement shall be a public one, that it shall confer an especial benefit upon the property to be assessed, and that the apportionment of the assessments shall be made upon some basis that is uniform and free from unjust discrimination.

A definition of a "local improvement" which seems to have commended itself to the courts of many jurisdictions, and which meets with our unqualified approval, is that given by the Arkansas supreme court in *Crane* v. *City of Siloam Springs, supra:* "If we look for the technical or legal meaning of the phrase 'local improvement' we find it to be a public improvement, which, although it may incidentally benefit the public at large, is made primarily

for the accommodation and convenience of the inhabitants of a particular locality, and which is of such a nature as to confer a special benefit upon the real property adjoining, or near the locality of the improvement.'' There is nothing in this definition to exclude the idea of an improvement district embracing the entire city; and we can perceive no sound reason for holding that the fact that the rise in value is common to all the real estate within a municipality should prevent the benefit from being sufficiently peculiar for local assessment purposes. It would be a matter for regret if the law as worked out by the courts respecting the constitutional power of the legislature should be found to have taken so scholastic a form, when dealing with the definition of the term ''local improvement,'' that an assessment for an improvement which benefited ninety-nine per cent of the real property within a city might be unheld, whilst one which benefited one hundred per cent of the urban real estate could be paid for only by general taxation. The Arkansas supreme court, in the Crane case, makes a forceful presentation against any such narrow limitation upon the legislative power, saying: ''No express limitation is found in the constitution forbidding the legislature from authorizing such an equitable apportionment of the assessment in case of an improvement affecting all the real estate of the city, and none should be adduced by implication through a narrow and technical line of reasoning; for this would not only be contrary to the usual rule of allowing the largest liberty in matters of local concern, but, if we should find such a limitation, it would puzzle us to say at what point the power of the legislature would stop. Could it authorize an assessment for an improvement affecting nine-tenths or ninety-nine hundredths of the real property of the city, but not for one affecting the whole city? If a city has one hundred streets, may the legislature authorize the council to place ninety-nine of them in an improvement district for the purpose of laying water-pipes along them or for improving them, and yet not authorize such a district covering all the streets for such a purpose? What could be the object in making such a limitation, and why make such a distinction? We do not see any reason for, nor do we believe that the constitution contains, any such limitation upon the

power of the legislature.'' In *Matthews* v. *Kimball, supra,* the court says: ''The only limitation as to the character of the improvement is that it must be a local improvement and of a public nature; that is, *local to the city and the inhabitants thereof* (italics ours), and public to the extent that it shall be free to the public under such proper regulations as may be adopted for its control, management and preservation by the city council.''

Although not giving direct consideration to this question, one of the district courts of appeal of this state (division one, first appellate district), as well as the United States circuit court of appeals, has indirectly passed upon it by holding that the legislative body of a municipality may create an assessment district coextensive with the boundaries of the city and assess all of the privately owned real property situated therein. (*Kane* v. *Wedell, supra; McGarry* v. *Ellis, supra,* and *Minnesota etc. Improvement Co.* v. *Billings, supra.*) Since such an assessment district may be upheld only upon the theory that all of the privately owned lands within the city are especially benefited by the improvement, the cases last cited become authority for the proposition that an improvement is none the less a ''local improvement,'' and the benefits accruing therefrom are none the less ''special,'' merely because the improvement benefits all the lands within the confines of the municipality.

Our views upon this branch of the case may be summarized thus: It is demonstrable that the proposed improvement will tend to increase, or at least to stabilize, the market values of all the real properties within the city, thus conferring a financial benefit upon every lot owner, so that the lot owners of the city, as lot owners, will be benefited by the improvement. Such benefits are ''special,'' since the benefits which land owners receive from a public improvement by virtue of their ownership of real properties may be regarded as special, even though the improvement be constructed in part for the benefit of a greater number of persons, all of whom, including the lot owners, are in fact benefited thereby. (2 Page and Jones on Taxation by Assessment, p. 1118.) Since the receipt of special benefits, actual or presumptive, by the property to be assessed is the sole underlying principle of,

and the one fundamental justification for, special assessments, there can be no sound reason why all of the lots within a municipality may not be assessed if all of them are specially benefited. The fact that the benefit is common to all of the lots within the city is not a determining factor; it is, indeed, a false quantity in the problem.

This disposes of the questions raised in opposition to the issuance of the writ.

It is ordered that respondent, H. W. Ensign, as superintendent of streets of the city of Dinuba, forthwith execute with the Federal Construction Company the contract referred to in the petition herein, that he approve the bonds referred to in the petition, and that he fix a time for the commencement and completion of the work to be done under that contract; also, that petitioner recover its costs.

Works, J., and Craig, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on November 23, 1922.

All the Justices present concurred.