** Summary **
SCHOOL PROPERTY EXEMPT FROM CONNECTION FEES WHICH ARE TAXES Cities can generally require that school districts pay a water and sewage connection fee, as a prerequisite for acquiring a building permit. However, those water and sewage connection fees that are in the nature of a tax do not apply to school district property since such property is exempt from taxation under the provisions of Article X, Section 6, Oklahoma Constitution. The Attorney General has had under consideration your letter dated June 21, 1972, where, in effect, you ask the following question: (1) Title 74 O.S. 324.11 [74-324.11] (1971) requires that school districts prior to construction or major alteration of school buildings must first secure a building permit from the city, town or county in whose jurisdiction the proposed construction is located. Is it lawful for cities to require school districts, in acquiring a building permit, to pay a water and sewage connection fee (tap charge) in addition to the fee for the building permit? In your letter you relate an example of where an independent school has applied to a city for a building permit to construct a school within the city limits. The city is withholding the issuance of the permit until the school district conforms with an ordinance which levies a tap charge to connect into the city water and sewer systems. To date, the school district has tendered payment for the building permit fee, which is approximately $1,000, but has refused to pay the once only tap charge fee, which is in excess of $7,000. The Legislature since 1965 requires cities, towns and counties or the State Fire Marshal to issue permits for construction or major alterations of certain buildings and structures. This directive is found in Title 74 O.S. 324.11 [74-324.11] (1971), which states in part: "No . . . school district . . . shall commence the construction or major alteration of any building or structure to be used as a school . . . or install original equipment for the operation and maintenance thereof without obtaining a permit. Said permit, for which a charge may be made in conformity with the local ordinance, shall be obtained from the city, town or county in whose jurisdiction the construction or alteration is planned . . . in all geographic areas wherein no such permit is required by local authorities a permit must be obtained from the Fire Marshal . . . he shall refuse to issue such permit unless the work so planned is in accordance with the applicable provisions of the National Building Code . . ." The statute, in addition to covering school buildings, also requires permits for apartment houses, nursing homes, churches, hospitals and other such buildings where large numbers of the public may congregate. The clear intent of the Legislature in enacting 74 O.S. 324.11 [74-324.11] (1971) was to require a building permit system whereby certain minimum safety standards were to be complied with in the construction and renovation of buildings where the public may gather. In your example the city has an ordinance which provides: "Section 1. "From and after April 1, 1970, the building inspector is authorized and directed to collect, prior to the furnishing of water or the furnishing of sewer services or prior to the issuance of a building permit for the construction or addition to any residential dwelling unit or commercial, business or industrial structure unit, a charge equal to the product determined by multiplying the square feet of new floor area times the adjusted amount of 10 cents, such 10 cent standard shall be adjusted as set forth in subsection (C) of this section. "Section 3(C): "The charges to be made and collected by the building inspector as authorized and directed herein shall be adjusted by him each calendar year by increasing or decreasing the charge to be made for the ensuing calendar year by the percent increase or decrease in the construction cost and prices as reflected by the Dallas Construction Index for the preceding calendar year. "Section 5. "Section 17-71, providing for a flat fee or charge of $35.00 for connection to the sewer lines of the City, and Section 18-73, providing for surcharges in certain subdivisions, shall be and the same are hereby repealed." To analyze the nature of the tap charge, we must first consider the sources of municipal revenue in Oklahoma. The sources of revenue have been classed very broadly under three headings: taxes, special assessments, and revenue from profits of municipal ownership of public utilities and businesses. "Source" is being used in the sense of a power or right delegated by, inherent in, or derived from the Constitution and statutory laws of Oklahoma. (Warren, Municipal Operation of Public Utilities, 1 Okl. Law Review 95 (May, 1948). It has been held that municipal corporations can exercise only such powers of legislation as are given them by the lawmaking power of the State. (Magnolia Petroleum Co. v. City of Broken Bow,184 Okl. 362, 87 P.2d 319 (1939); City of McAlester v. Grand Union Tea Company, 186 Okl. 487, 98 P.2d 924, (1940). Title 68 O.S. 2701 [68-2701] (1971) authorizes municipalities to assess, levy and collect taxes for general and special purposes of municipal government as the Legislature may levy and collect for purposes of state government except ad valorem property taxes. Provided, taxes shall be uniform upon the same class subjects, and any tax, charged, or fee levied upon or measured by income or receipts from the sale of products or services shall be uniform upon all classes of taxpayers. The power of a municipality to license is also held to be a delegated power. Title 11 O.S. 651 [11-651] (1971) enumerates the kinds and character of businesses that are subject to local license fees. Grants of licensing power such as those found in 11 O.S. 651 [11-651] (1971) are strictly construed. (Grantham v. City of Chickasha, 156 Okl. 56,9 P.2d 747 (1932). This section has been held to impose a license tax for revenue as distinguished from police regulation. It is apparent that the tap charge was not enacted under a licensing power because a school district is not among the class enumerated in 11 O.S. 651 [11-651]. ArticleX, Section 6 of the Oklahoma Constitution states: "All property used for free public libraries, free museums, public cemeteries, property used exclusively for schools, colleges, and all property used exclusively for religious and charitable purposes, and all property of the United States, and of this State, and of counties and of municipalities of this State . . . shall be exempt from taxation." (Emphasis added) Article X, Section 7 of the Oklahoma Constitution states: "The Legislature may authorize county and municipal corporations to levy and collect assessments for local improvements upon property benefited thereby, homesteads included, without regard to a cash valuation." We note that by statute and precedent the law is settled that neither constitutional nor statutory provisions exempting property from taxation serves to exempt property from levy of special assessments. (Blythe v. City of Tulsa, 172 Okl. 586,46 P.2d 310; Wilson v. City of Hollis, 193 Okl. 241, 142 P.2d 633). The basis of this rule lies in the distinction between a general tax and a special assessment. A general tax is levied for the general public good without regard to possible benefits which may be conferred upon the property or individual taxed. Special assessments are levied against particular property to enforce payment for a benefit created upon the property of a value corresponding and equal to the amount of a special assessment. (Emphasis added) (City of Idabel v. School District No. 5, McCurtain County, 434 P.2d 285 (1967); Cooley Taxation (2nd Edition) at 650 et seq.; 48 Am.Jur. Special or Local Assessments, 3, 21; Okl. Ry. Co. v. Severns Pav. Co., 67 Okl. 206, 170 P. 216, 10 A.L.R. 157). A special assessment is a special charge levied on a parcel of real estate to make it share the cost of some abutting public improvement which has been of direct financial benefit to the particular tract. It has been held that the power to levy a special assessment is not absolute and unqualified but must be exercised strictly within constitutional limits. The limitations on the power of the special assessment are that the improvement shall be a public one, that it shall confer a special benefit upon the property to be assessed, and that the apportionment of assessment shall be made upon some basis that is consistent and free from unjust discrimination. Also, the amount assessed may not exceed the value of benefit conferred by the improvement. (Oklahoma Constitution, Article X, Section 7; McGoldrick, The Law and Practice of Municipal Home Rule, 343, 1933; Berry v. McCormick, 91 Okl. 211, 217 P. 392 (1923); Matthews v. Kimball, 70 Ark. 451, 66 S.W. 651 (1902); Federal Construction Co. v. Ensign, 59 Cal.App. 200, 210 P. 536
(1922); Warren, Taxation: Municipal Operation of Public Utilities, 1 Okl. Law Review 95, 100, May, 1948). Although assessments for local improvements are an exercise of the taxing power, they are to be distinguished from general taxation for revenue and hence, a general constitutional or statutory exemption of public school property from taxation does not extend to public assessments for local improvements. (Annot. 15 A.L.R. 3rd 849, 851 (1967). Based upon the distinction between taxation and special assessments, the Supreme Court of Oklahoma has upheld various levies by municipalities upon school district property. Street paving and improvements is considered a special assessment. (Board of Education v. Chickasha, 195 Okl. 127, 155 P.2d 723 (1945); Healdton v. Board of Education, 204 Okl. 579, 232 P.2d 148 (1951). And more recently, a school district was required to pay their proportionate share for the financing of a sewer improvement district. (City of Idabel ex rel L. W. Woodroof v. School District Number Five (5) of McCurtain County). In the present case, the school district has paid its share for street paving; it has paid to have sewer and water lines installed; and it has tendered approximately $1,000 to the city for the building permit as allowed by 74 O.S. 324.11 [74-324.11] (1971). The last major source of municipal revenue is profits derived from municipal ownership of public utilities. (Warren, 1 O. L. R. 95, (May, 1948). The constitutional authority for municipal ownership of public corporations is contained in Article XVIII, Section 6 of the Oklahoma Constitution: "Every municipal corporation within the state shall have the right to engage in any business or enterprise which may be engaged in by a person, firm, or corporation by virtue of a franchise from said corporation." This same subject is also embraced in 11 O.S. 563 [11-563] (1971). The Oklahoma Supreme Court has recognized that municipalities acting in a proprietary function may prescribe rates for service from municipally-owned utilities. (Sharp v. Hall, 198 Okl. 678,181 P.2d 972; Chastain v. Oklahoma City, 258 P.2d 635). In the Sharp and Chastain cases the Court stated that since a sewer system was a public utility, the municipality could lawfully make a charge for its use basing the amount thereof on the amount of water used, and making the person purchasing the water liable therefor. It is to be emphasized that in both the Sharp and Chastain cases, the municipality fixed, as a basis for computing the charge for the use of the sewer, the volume of water delivered to the user through the water meter. Presumably following the Sharp and Chastain cases, the ordinance in question, has provided for a capitol improvement charge based upon the amount of water usage which is in addition to the monthly sewer service charge. There is a $1.00 flat fee for residences and a sliding scale fee consisting of fifty percent of the sewer service charge for all businesses or commercial establishments. The school board has consistently paid both the sewer service charge and the capitol improvement charge calculated at fifty percent of the monthly service charge. The ordinance in your example provides that the levy for the tap charge shall be ten cents per square foot of floor space, and also states that the rate per foot will be adjusted according to construction cost. The levy now stands at twelve cents per square foot. There has not been a reason given which would explain why the tap charge is based upon a fee of twelve cents per square foot. It does not seem that the basis for determining the tap fee rests upon the possible criteria as the amount of water used or the number of people using the facility. It appears that the floor space of the building to be constructed does not satisfy the special assessment requirement of an equal charge for an equal benefit conferred upon the property. Nor does a fee based upon floor space appear to conform to a sliding scale standard based upon the amount of water used. It would be entirely possible to levy a higher tap fee for a large warehouse with only one lavatory facility with minimal water and sewage use, and at the same time levy a much lower tap charge on a smaller residential dwelling with three such facilities. The charge levied is incidental to water and sewage usage or service. The levy based upon the amount of square footage contained in the building appears to be nothing more than a revenue raising measure enacted by the city. This becomes more apparent when one considers how the fees collected from the tap charges are spent. The ordinance in question has been supplemented by another ordinance which sets out how the revenues collected from the tap charge are to be spent. It is provided that the monies derived therefrom may be devoted and expended (1) to pay debt service on outstanding bonds on which revenues from the sale of water and/or sanitary sewer services by the city have been or hereafter may be pledged; (2) to pay for the maintenance and interpretation of the city's water and sanitary sewer system; (3) to pay for all extensions, renewals, replacements and additions to the water and sanitary sewer systems of the city, including engineering studies, legal fees, and all other costs incidental thereto; and (4) to use any excess funds for any lawful utilities purpose. By resolution the city has also provided that any surplus not needed for the operation of such public utility, shall be deposited in the general fund or sinking fund of said city. (Emphasis added) The fact that excess revenues may be deposited in the general fund to be used as determined by the city council reinforces the fact that the charge cannot be a special assessment which by definition must correspond and be equal to the benefit created. (City of Idabel, supra). While it is recognized that revenue derived from municipally-operated utilities may be deposited in the general fund, the Oklahoma cases indicate that the income secured has been based upon a standard relating to actual use of water. (Hall and Chastain, supra). Citing cases from other jurisdictions is of little effect because the law in Oklahoma is clear on the distinction between taxation, special assessments, and revenue raised by city-owned utilities. However, a Utah case, Murray City v. Board of Education, 396 P.2d 628 (1964) has been cited as authority for the proposition that a tap charge is a charge for a benefit created. In that case the city had levied a charge upon school district land which was a combination of a tap charge and a recurring monthly service charge based upon the number of pupils attending school within the district. The Supreme Court of Utah did not make a differentiation between the initial connection charge and the recurring monthly service charges. The two were of a different nature. The monthly service charge was directly related to the use of the city water and sewer services based upon the number of pupils in school. On the other hand, the ordinance in question is only concerned with the initial connection fees and no attempt is made to relate a twelve cent per square foot standard to any benefit conferred by the water and sewer system. It is clear that the tap charges based on the type of ordinance is question are revenue raising measures in the nature of a tax and as such would not be applicable to school district property. It is, therefore, the opinion of the Attorney General that your question be answered as follows: Cities can generally require that school districts pay a water and sewage connection fee, as a prerequisite for acquiring a building permit. However, those water and sewage connection fees that are in the nature of a tax do not apply to school district property since such property is exempt from taxation under the provisions of Article X, Section 6, Oklahoma Constitution. (Marvin C. Emerson)