[Civ. No. 6280. First Appellate District, Division One.—September 6, 1928.]

J. E. MILLS et al., Appellants, v. CITY OF ELSINORE (a Municipal Corporation) et al., Respondents.

Sarau & Thompson and Swing & Wilson for Appellants.

George W. Crouch, City Attorney, Wm. G. Irving, Wm. M. Brown and Loyal C. Kelley for Respondents.

CAMPBELL, J., *pro tem.*—The board of trustees of the City of Elsinore, a city of the sixth class, on March 12, 1925, passed resolution of intention No. 117 declaring its intention to construct a water supply and distributing system for fire protection and domestic water supply, it being declared therein that the proceedings were being taken pursuant to the "Improvement Act of 1911" [Stats. 1911, p. 730] and the "Improvement Bond Act of 1915" [Stats. 1915, p. 1441]. Steps were subsequently taken resulting in the acceptance of the bid of the defendant Claude Fisher for the performance of the work, and a resolution was adopted by the board awarding the contract therefor to defendant Fisher. Within ten days from the first publication of the notice of award of the contract to defendant Fisher, the plaintiffs, J. E. Mills and Mabel A. Mills, with others, all owners of land liable to assessment, filed with the clerk of the board a written notice and protest, claiming that the previous acts and proceedings relating to the improvement were irregular, defective, erroneous, and faulty, which notice stated that it was given and the protest made pursuant to the provisions of section 16 of the Improvement Act of 1911, and specified that the acts and proceedings were irregular, defective, and erroneous, and faulty, in a number of respects, the following being set forth in appellants' brief, to which our attention is directed: "(1) That the Resolution of Intention does not correctly describe the location of the work and improvement; (2) That the char-

acter and dimensions of the reservoirs to be constructed are not delineated upon the plans and profiles; (4) That the specifications unlawfully delegate discretion to the Superintendent of Streets; (5) That neither the materials nor the character nor quality thereof to be used in making said improvements are described with any degree of certainty; (10) That the Resolution of Intention does not refer to the streets to be improved by their lawful or official names; (11) That the property and rights of way upon which a portion of said improvement is to be constructed are not described in the Resolution of Intention; (12) That the Resolution of Intention does not briefly describe the work to be done; (13) That the Resolution of Intention does not give the location of the proposed improvement; (14) That the plans, profiles and specifications do not give a full and detailed description of said work and improvement; (15) That no detailed description of said work or improvement is set forth in said proceedings; (21) That authority is illegally and improperly vested in the City Engineer.''

Curt Miller, superintendent of streets, entered into the contract with defendant Fisher, who entered upon the execution of the work. Plaintiffs thereupon brought this action against the City of Elsinore, the five persons constituting its board of trustees, the clerk, treasurer, and street superintendent and the contractor, Claud Fisher, praying for an injunction *pendente lite*, as well as a permanent injunction, restraining the performance of the work and improvement, the making of any assessments or the issuing of any bonds to cover the cost thereof, and restraining the imposing or creating of any cloud, lien or assessment upon the land of the plaintiffs, and praying for a decree adjudging that the contract is invalid and that the proceedings leading up to the execution of the contract were irregular, defective, erroneous, and faulty. The application for an injunction *pendente lite* was denied, and upon the trial on the merits judgment was rendered for defendants, and from this judgment plaintiffs have appealed.

It is contended that the judgment should be reversed for the following reasons: (a) That the board of trustees has no power under the act to construct buildings, or purchase or install motors and electrical apparatus; (b) that because of defects in the resolution of intention the board never ac-

quired jurisdiction to order the improvement; (c) that variance and ambiguities invalidate the proceedings and the contract; (d) that the work and improvement is not sufficiently described; and (e) that unlawful discretion and power is delegated to the superintendent of streets and the city engineer.

We shall discuss the points in the rotation in which they are urged. As to assignment (a) that the board of trustees has no power under the act to construct buildings or install motors and electrical apparatus, it may be said that authority to do such is contained in section 2 of the Improvement Act of 1911, as amended, which provides for the ordering upon any street, public property, or right of way of a city "wells, pumps, dams, reservoirs, storage tanks, tunnels, conduits, pipes, hydrants, meters or other appurtenances for the supplying or distributing a domestic water supply." In addition to the general power, subdivision J of section 2 provides for general incidental powers with reference to the improvement of streets, public property, etc., and subdivision K of section 2 provides for all other work auxiliary to any of the above which may be required to carry out the same. Appellants contend that because the resolution of intention provided for certain buildings, and electric motors to operate the pumps, that the power granted by the legislature has been exceeded, and in support of their contention cite *Thompson* v. *Hance*, 174 Cal. 572 [163 Pac. 1021], *Federal Construction Co.* v. *Ensign*, 59 Cal. App. 200 [210 Pac. 536], and *Spring Street Co.* v. *Los Angeles*, 170 Cal. 24 [L. R. A. 1918E, 197, 148 Pac. 217]. In the Thompson case it is held that work of an entirely different and independent character from that specified in the act could not be justified by virtue of a blanket provision in the Vrooman Act corresponding to subdivision J of section 2 of the Improvement Act of 1911, and the Federal Construction Company and Spring Street cases hold that under our system of government no assessment can be made upon any land on any principle other than that of special benefits actually or presumptively received.

The manifest intention of the Improvement Act and of the language used with relation to appurtenances and auxiliary work make it apparent that the legislature not only intended to provide for the installing of wells and pumps,

conduits, and pipes, but whatever may be reasonably necessary for supplying and distributing the water to its consumers. The act itself characterizes the general power, and then uses this language: "All other appurtenances for supplying or distributing a domestic water supply," and further on, "All other work auxiliary to any of the above which may be required to carry out the same." The legislature certainly did not intend that wells might be drilled and pumps installed, but that they must be left in the broad outdoors unprotected from the elements. To adopt the interpretation urged by appellants would be to create a system which would be useless until some foreign or intervening agency intervened to convey the water into the lines and to the pipes of the consumers and to the fire hydrants. We think the legislature meant to create a water supply, distributing and development system. It could not be expected to specify in the act all of the details of appurtenances and auxiliaries necessary to a perfect system.

Under specification (b) that because of defects in the resolution of intention the board never acquired jurisdiction to order the improvement, appellants claim that the resolution of intention does not briefly describe the work in that it does not define and locate the right of way for the discharge pipe from the pumping station. The language used in the resolution in this respect is: "and such water well and pumping plant construction work shall include the construction of a wrought steel discharge pipe from said pumping station and on a straight line, across an alley, over certain property belonging to said city and along a right of way therefor, across Langstaff street to a point adjacent to the east line of lot 23, block 87, of said tract." The language immediately preceding had dealt with and defined the location of the pumping plant, namely, upon lot 13, block 80, Heald's Subdivision of Elsinore, and the entire resolution of intention is tied up to the plans and specifications. The location of the pumping plant having been specified and the resolution of intention stating that this pipe-line runs in a straight line from this pumping plant across the alley and across Langstaff Street to a point adjacent to the east line of lot 87, furnishes a brief description of the work, and the plans referred to indicating exactly where the pipe-line is to be laid, sufficiently complies with

the law. (*Richmond* v. *Growney*, 29 Cal. App. 427 [155 Pac. 1008].) From the plans it appears that the line in question runs straight from the lot on which the pumping plant is located, which is lot 13, block 86, to a point on the east line of lot 23, block 87. The exact point on the east line of lot 23, block 87, is not shown upon the plans by the number of feet at that particular point, but it does appear that the pipe-line intersects a point on the north line of lot 13, block 87, 50 feet from the northeast corner of such lot, and also intersects the east line of lot 23, block 87—a 60-foot lot—hence the exact location is easily ascertained. Again, it appears that the pipe-line continues in a straight line to the center of the pump-house located on lot 13, block 86, which point is 44 feet from the east line of such lot and 12 feet from the north line thereof. Therefore, if a line as shown on the drawings starts from a point on the lot mentioned, which point is 44 feet west of the east line and 12 feet south of the north line of such lot and then reaches a point on the north line of such lot, which is 50 feet west of the northeast corner, as shown by the drawings, and the line running in a "straight line" as defined in the resolution of intention, it could only intersect lot 23, block 87, at one definite point.

Referring to appellants' further objection under this heading that the extent of the right of way, its termini, width, etc., is not sufficiently located, it may be said that plan No. 117 (Defendants' Exhibit No. 14–D) shows the notation with respect to this line as follows: "Trench one foot west of west line of lot 12 of block 5." The clause "over a certain right of way belonging to the city adjacent to the westerly lines" of certain lots taken in connection with this plan sufficiently locates the right of way, as it adjoins the west line of certain given numbered lots, at the most farthest in one direction and ends at the end of the lot most farthest in the other direction, which sufficiently fixes the termini of the right of way. The same objection is made with relation to the reservoir. The resolution of intention states upon what particular lots of a given tract of land the reservoir is to be located and refers to the plans for further particulars. The plans show that the reservoir is located upon a parcel of land, one corner of which is the north corner of lot 25, block 14, Country Club Heights Unit No. 3; another

corner of which is the east corner of lot 25, block 14, of the same tract; the third corner is the southerly corner of lot 39, block 14, of the same tract, and the fourth corner is the westerly corner of lot 39, block 14, Country Club Heights Unit No. 3; that the reservoir extends to within five feet of the outside property lines of this parcel of land. On the bottom of exhibit 14–N appears the cross-sections of the reservoir given in each direction, and on the plan also appears the lot numbers. It is true that in the specifications there is an error in that one of the lots upon which the reservoir is to be located has been omitted. This lot, however, which is lot 33, would fall in the center of the parcel of land and the error, therefore, would mislead no one. Furthermore, paragraph 52 of the specification provides: "Any work, material or apparatus appurtenant to the work of making a complete job, which shall be specified in these specifications and omitted from plans, or which is shown on plans or drawings and omitted from the specifications shall be considered as both part of plans and specifications, and the contractor shall furnish said work, material or apparatus."

Appellants urge under assignment (c) : "That variances and ambiguities invalidate the proceedings and the contract," that where, as here, the description of the work is partly in the plans, and partly in the specifications, a variance or conflict in the description with respect to the extent of the improvements, materials to be used, etc., constitutes a fatal defect and invalidates the proceedings. That the resolution of intention provides for the improvement of Poe Street where no pipe-line is to be laid, and therefore, that this constitutes a conflict; but an inspection of plan No. 115 (Defendants' Exhibit 14–B) shows that at this particular block Poe Street is "vacated" and is so marked and, therefore, it is not Poe Street at all. The same applies to the objection as to two pipe-lines on Graham Avenue where the discrepancy exists as to whether there is to be one or two pipe-lines.

The next objection which the appellants present relates to the fittings indicated in part by plan No. 117 (Defendants' Exhibit 14–D), particularly referring to intersections designated as intersections 1 and 6, and they urge that by reference to plan No. 114 (Defendants' Exhibit 14–A), which is connected up with plan No. 117, it appears that inter-

sections Nos. 1 and 6 are outside the city. Appellants, however, overlook the notation of explanation appearing on plan No. 114 and also on plan No. 117, reading as follows: "The profiles referred to are often more extensive than the plans and are to be disregarded except in so far as they relate to the lines indicated on plans and mentioned in resolution of intention." This makes it clear that where an intersection is shown extending beyond the lines indicated in the resolution of intention and shown upon the major plans, that it has no reference to the work to be done. Plan No. 114 (Exhibit 14–A) is one of the major plans. In the southwesterly corner of this plan is a rectangular portion wherein the city limits line is indicated by a dotted line and wherein is noted on each pipe-line indicated that it "is not a portion of the improvement." The figures 1 and 6 referred to by appellants, and which figures appear in circles, relate to a detail plan of the intersection. On this major plan No. 114 (exhibit 14–A) appears also the explanation: "Figures in circles correspond to enlarged detail." With this explanation that appears upon these two plans we cannot see how any person could understand that it was his duty to construct fittings on a pipe-line not to be laid, not described in the resolution of intention, which lies outside the city limits, and which is especially excluded by appropriate notations made upon the major plans.

Again, appellants complain that there is a discrepancy between plan 116 (Defendants' Exhibit 14–C) and plan 123 (Defendants' Exhibit 14–J) in that the latter shows an eight-inch pipe-line, both north and south of the intersection with Flint Street, while the former shows the eight-inch pipe-line on Main Street to extend from a point fifteen feet from the north line of Flint Street, in a southerly line to the north line of Mountain View Avenue and a six-inch pipe-line to extend from the last-named point in the intersection of Flint Street northerly to Minthorn Street. Plans 115 and 116 (Defendants' Exhibits 14–B and 14–C) are major plans as distinguished from special detail plans of appurtenances and accessories. Plan 123 (Defendants' Exhibit 14–J) is one of the detail plans. We do not understand that there is any conflict here. The intersection on the last plan shown as F–One may well be reasonably construed to indicate only the eight-inch pipe in the immediate

vicinity of the fire hydrant. This latter plan is not a plan of the pipe-lines, but is a plan of the fire hydrant details. The following notation and instruction appears on Plan No. 116 (Defendants' Exhibit 14–C): "For detail of pipe fittings of intersections see Plan No. 118. Figures in circles correspond to enlarged detail. For fire hydrant details see Plan No. 123. Profiles referred to are often more extensive than the plans and are to be disregarded except in so far as they relate to the lines indicated on the plans and mentioned in the resolution of intention." It would not be expected, therefore, that reference be had to plan No. 123 except for information respecting the fire hydrants and their appurtenant details. Therefore, there is no necessity or purpose of showing the size of the pipe-lines except in the immediate vicinity of the fire hydrant connection. This fire hydrant connection is indicated by letter "T" placed horizontally and appears upon plan No. 123 (detail F–1) to be upon the pipe-line situated on Main Street at a point five feet south of the south line of Flint Street. Since it is an eight-inch pipe at that place and continues to be an eight-inch pipe until it reaches a point within 15 feet of the north line of Flint Street, there is no conflict. The entire purpose of these drawings in plan No. 123 being to show the hydrant details, they are made so as to embrace only the points of intersection where the fire hydrant is to be placed, it is a reasonable interpretation to say that the size of the pipe as placed upon these intersection drawings has particular reference only to the point or juncture of the pipe-line with the fire hydrant and its fittings. Furthermore, the lines showing the pipe-lines as appears upon these detail drawings indicate definitely no point of beginning and no point of ending. The drawing does, however, definitely indicate the fire hydrant, its location and appurtenances, and that, as a matter of fact, as otherwise affirmatively appears from the quotation we have just made and which is noted on the other plan, is all the information that this plan No. 123 was ever intended to convey.

Again, complaint is made that plan No. 118 provides for the construction of certain fittings at intersections Nos. 30 and 35, but that plan No. 116 recites that intersections Nos. 30 and 35 are not part of the drawings. This is the same

character of objection we have already considered as to the work noted on major plan No. 114 as being outside of the city limits and which work is to be omitted. Major plan 116 shows that the pipe-line situated at the southerly end of block 504 and lying between Granite Street and East Hill Street bears the notation, "Not a part of proceedings." Also on the same map and immediately south of the line just above noted and situated at the northerly termination of Dutton Street shows another line extending eastward to East Hill Street, which bears a similar designation. On this same plan and appearing in circles are the figures "30" and "35" and written in between these circles is the notation, "Not a portion of proceedings." There is also an explanation on this plan reading as follows: "For detail of pipe fitting at intersections see Plan No. 118. Figures in circle correspond to enlarged detail. For fire hydrant details see Plan No. 123. The profiles referred to are often more extensive than the plans and are to be disregarded except in so far as they relate to the lines indicated on the plans and mentioned in the resolution of intention." Plan No. 116 being a major plan and plan No. 118 being a detail plan of pipe fitting, no one, with these explanations appearing on the major plan, would conclude that the pipe fittings at intersections 30 and 35 were to be constructed under these proceedings. To adopt such a construction would be to disregard the notations and explanations appearing upon the major plans and to ignore the descriptions set forth in the resolution of intention, which specifically omit these particular pipe-lines and to adopt a conclusion that pipe fittings are to be established at points and places where there is no pipe-line whatever to be constructed.

The next point made is that plan No. 120 (Defendants' Exhibit 14–C) with respect to one of the vertical motors provides that it shall have 20 horse-power and that the specifications provide that the motors "shall be of ample H. P. to satisfactorily carry the maximum load under which they will be required to operate without over-heating." If there were no further explanations appearing in the proceedings, such a point would not be of any particular merit unless in conjunction therewith it is shown that 20 horse-power was either not ample to carry the load or was in excess of that needed. It must be remembered that this

provision of the specifications does not have reference in particular to any one motor shown upon the plans, but was a general specification with relation to a number of different motors. There is another explanation to be adopted and that is that these motors are for the purpose of operating the pumps. The specifications provide, with respect to the different pumps, that they shall be of a certain design or equivalent. In this particular instance the Kimball type pump is designated on the plan. The specifications for the different pumps provide the capacity each pump must deliver, that is, speaking of pump at station No. 1, "the pump shall have a capacity of between 260 and 280 gallons per minute operating against a head of 125 feet." If the construction be adopted that the contractor was at liberty to furnish an equivalent type of pump and that an equivalent pump would require a motor of horse-power exceeding 20 horse-power, then it would be his duty to supply the type of motor demanding a greater horse-power.

There is no merit in the objection that plan No. 120 provides that the pump at station No. 2 is of a 450-gallon per minute capacity, while the specifications relating to the capacity of the pump say that it shall be "between 440 and 460 gallons per M. operating against a head of 125 feet." The notation appearing upon the plan is necessarily the "rated" capacity of the pump. In actual working conditions pumps of a given definite capacity will perform differently according to whether they lift in hot or cold water, or operating at different elevations above sea level. The proper explanation of the plans and specifications is that they are to supply a pump of theoretical rated capacity of "450 G P M" (which is a technical pumping engineering term), capable, at the conditions existing in the City of Elsinore, of delivering between 440 and 460 gallons per minute, operating against a head of 125 feet. In actual practice, even a layman knows that a pump of rated capacity frequently varies somewhat in its actual performance under varying conditions.

The next objection made is that plan No. 120 provides for "overload relay," and that the resolution of intention provides, in general terms, for "overload relays" without definitely specifying that there are more or less than one.

It is a rule of construction that the plural may mean a

singular or a singular may mean a plural wherever from the context the definite meaning is clearly ascertainable. The "overload relay" is composed of a magnetic control coil on each of two of the leads leading from the source of power to the motor. Each one of these coils is an "overload relay" in itself, but in construction two of them exist and are also considered as a unit by itself, and, therefore, in engineering terms they may be variously referred to as "overload relay" or "the overload relays." The same sort of an objection is made with regard to the resolution of intention, where, after providing for the construction of the pump, it says, "together with the necessary steel suction pipe, strainers," etc. The plan indicates only one strainer is necessary. An error of this kind in using the singular instead of the plural taken in connection with the context becomes immaterial.

Again, appellants complain that the specifications with relation to the pump at station No. 3 provide that it shall be of the underground discharge type. That merely means that it is so constructed that with its appurtenances and connections water can be conveyed directly from the immediate vicinity of the pump to the underground line. The pump could still be of the underground discharge type. If we take plan No. 121 (Defendants' Exhibit 14-H), of which they complain, and compare it with plan No. 117 (Exhibit 14-D), we will see that fifteen feet from the center of the well and immediately to the south of it is located the concrete receiving tank; again, if we refer to plan No. 119 (Defendants' Exhibit 14-F), we will perceive that the discharge pipe from the pump to this receiving tank, which is fifteen feet distant therefrom, enters the receiving tank at a point one foot and ten inches below the ground line. For practical purposes, therefore, it sufficiently appears that the discharge would be elbowed down to meet the underground pipe coming from the receiving tank and this would be sufficient compliance to cover the use of the term "underground discharge." Moreover, appellants have not shown that there is any radical difference of construction or of cost between this type of discharge pipe and some other method or that it would tend in anywise to increase or lower the cost or to have any effect whatever on the efficiency of the pumping plant.

Again, appellants complain that plan No. 124 (Defendants' Exhibit 14–K) provides for the construction of two switchboards at station No. 3, while plan No. 117 calls for the construction of only one switchboard. This is not a conflict. Where intricate construction work is indicated the plans must all be considered together to determine what the work to be done consists of. Plan No. 117 is intended to show the general location of the pumping station with relation to the lot and street lines. In a plan of this kind manifestly not all details could be shown on a single plan. It would be highly impractical to do so; many of the details would have to be drawn in such fine scale that they could not be seen with the naked eye. A switchboard is more or less of a generic term in electrical engineering and may consist of one, two or more panels. When we refer to plan No. 124 we have disclosed to us the system of wiring which could not be possibly indicated on the plan which was only intended to show the general outline.

Again, appellants complain that the resolution of intention provides that the pipe to be laid "shall be wrought steel screw pipe" and that the specifications provide that "all pipe is to be wrought steel welded pipe." This in itself is not a conflict. "A screw pipe" means that on the ends of each pipe threads are placed to permit it to be screwed to the next connecting pipe to be laid. A "welded pipe" does not have the significance that it is to be welded to the next connecting pipe, but merely means that in the manufacture of the pipe the longitudinal break, which is formed in the center of the pipe in the rolling of the steel plate which forms the pipe, is welded instead of being joined in some other manner.

The next objection made is the claim that the proceedings are invalid because on plan No. 117 there is a notation of two pieces of pipe totaling 32 feet in length, extending from the pumping station to the concrete receiving tank, that bears the mark "W I" pipe and that the resolution of intention and specifications call for "wrought steel" pipe. There is no explanation of what the lettering "W I" means in any of the proceedings, but there are abundant notations on this plan and specific requirements in the specifications and the resolution of intention to the effect that the pipe to be laid shall be "wrought steel" pipe.

With respect to objections of this character as occurring on plan No. 123 it may be said that plan No. 123 is not intended to be a plan of the pipe-lines, but is intended to show the fittings and fire hydrants at the intersections. The same observation applies with reference to the discharge pipe from the well as shown on plan No. 119.

The next objection is to the manner of describing the pumps, motors, and appurtenances. Objections are separately taken up as to each pump, but inasmuch as the objections made are for the most part merely repetitions of objections made to each pump, we will consider the objection only as to one of the three different pumps.

The description of the pumps and appurtenances at station No. 1 is set forth in the resolution of intention in subdivision D. The specifications provide further with reference to the pumps to be installed at that station, as is shown under the heading "Pumps" station No. 1. In general the pump is to be the Kimball type, auger pump or equivalent. Its capacity is to be between 260 and 280 gallons per minute operating against a head of 125 feet. The word "equivalent" in mechanical matters has a distinctive meaning in the trade, which is a combination of the ordinary use of the word and the meaning of the word as used in the patent law and indicates a device of practical equivalence in value and effect and of substantially the same design performing the same functions in practically the same manner.

Water pumps of this character are now practically standard. It is necessary only to tie up the resolution of intention and plans to make a size and type of pump, and make the plans sufficient to indicate a particular design or number and give a general outline such as will indicate the kind, size, and character of the pump wanted. If the plans, specifications and resolution of intention are sufficient with respect to this particular pump to indicate the adoption of a certain Kimball type, auger pump, as manufactured by the Frank J. Kimball Company or equivalent, it is not then necessary to show cross-sections and specifications of foundry make, manufacturers' details and patterns because a particular thing has been identified and is a standard article that can be supplied in the general market.

In order that these plans should receive the interpretation of the court as such interpretation would be given by a con-

tractor familiar with the business or by an engineer or manufacturer engaged in this line of duty, Mr. J. B. Griffin, an expert water and pump engineer, was called as a witness. From his testimony it seems that any person qualified to bid upon the work, or any person sufficiently familiar with plans of this character to draw reasonable and ordinary conclusions therefrom, would understand the work required to be done, and that there are no serious uncertainties in the descriptions, and that the cost of the works was definitely ascertainable.

This brings us to appellants' objection "that unlawful discretion and power is delegated to the superintendent of streets and the city engineer," and they urge that the law requiring certainty and definiteness in special assessment proceedings prohibits the delegation of any discretionary power by which the materials or extent or cost of improvement may be varied, and that the rule which requires that specifications must definitely and with certainty describe the extent of the work to be done, is subject only to an exception in cases where the details of the construction do not permit it, citing authorities in support of such contention. We are in accord with the law as stated, disagreeing with appellants only with relation to its application to the situation presented here.

Appellants have set forth in their brief a number of paragraphs from the specifications. Among those having to do with the delegation of discretionary power to the officers named is the following: "The nature of the work will necessitate leaving open considerable length of trenches, and the contractor shall have facilities for rapid back-filling, when so instructed by the engineer.—If so directed by the superintendent of streets, the filling shall be settled with water at not more than two intermediate depths, to be determined by the street superintendent before it is brought to one foot from the surface—No excavating material shall be removed from the street until back-filling is completed, but as soon as the trenches are refilled, in a manner satisfactory to the engineer." The remaining paragraphs reproduced by appellants in their brief have been sufficiently discussed. These objections, while being merely trivial, appear also to concern things which could not with reasonable diligence and cost be ascertained in advance and which would be

disclosed only in the doing of the work (*City Street Imp. Co. v. Kroh,* 158 Cal. 308 [110 Pac. 933]), as, for instance, whether the filling of the trench should be settled with water at one or two depths, or settled at all with water, would depend on the condition of the weather as well as the soil.

This brings us to appellants' final objection that no special or compensating benefit can arise from the construction of a municipal water system where only a portion of the city is assessed therefor.

█ The test of the right to create a public improvement by special assessment does not resolve itself upon the point as to whether there exists some general public benefit because every assessment proceeding contains an element of public benefit. The test is, does there exist with relation to the work a special and peculiar benefit to the property to be assessed. █ In the present case while not all the city is involved in the assessment district, there is no evidence showing that any part of the city could be benefited by the construction of any of the work save that part which is included within the district. It would, therefore, be unreasonable to require the payment to be made from general funds or by a bond issue over the whole city which is not benefited by the improvement. Furthermore, as is said in *Kane v. Wedell,* 54 Cal. App. 516, 521 [202 Pac. 340], "The statute undoubtedly was intended to authorize the city council to make whatever special improvement might be deemed necessary for the welfare of the city, or any part thereof . . . a power to include the whole city in one district if necessary for an improvement which affected the whole, or to divide the city into smaller districts for other special improvements which might affect only the particular sections so included."

█ As the variances and discrepancies complained of are on the whole slight, and as it does not appear that the cost of the work, because of such variances or the discretion vested in the engineer, materially increased or decreased the cost of the work, they do not vitiate the proceedings (*Mill Valley v. Bonding Co.,* 68 Cal. App. 372 [229 Pac. 891]).

█ The purpose of the resolution of intention and the plans and specifications is for the benefit of the property owners and contractors who are to bid on the work. If they are sufficiently certain and definite, upon all the details of

the work which materially affect its cost, to apprise bidders of all the essential and substantial parts of the work and enable them to know with reasonable accuracy the outlay they will have to make in performing the work to be contracted for, they are sufficient (*City Imp. Co.* v. *Kroh, supra*).

We think the proceedings sufficiently comply with the statute, and that the record contains no error calling for a reversal.

The judgment is affirmed.

Tyler, P. J., and Knight, J., concurred.

A petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on November 1, 1928.

All the Justices present concurred.